# IN THE SUPREME COURT OF IOWA

No. 13–1915

Filed June 30, 2015

Amended September 14, 2015

**STATE OF IOWA,**

   Appellee,

vs.

**JESSE MICHAEL GASKINS,**

   Appellant.

---

Appeal from the Iowa District Court for Scott County, Henry W. Latham II (motion to suppress), and John D. Telleen, Judges.

A criminal defendant appeals his convictions for possession of marijuana with intent to deliver, failure to affix a drug tax stamp, and knowingly transporting a revolver in a vehicle. He contends the district court erred in denying his motion to suppress evidence discovered after officers opened a locked safe they found inside the defendant's vehicle during a warrantless search incident to arrest. **REVERSED AND REMANDED.**

Mark C. Smith, State Appellate Defender, and Martha J. Lucey, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Tyler J. Buller, Assistant Attorney General, Michael Walton, County Attorney, and Patrick A. McElyea, Assistant County Attorney, for appellee.

**HECHT, Justice.**

After making a routine traffic stop for an expired license plate, a police officer smelled marijuana and confiscated one marijuana blunt from the motorist. The officer ordered the motorist from the vehicle and arrested him for possession of marijuana. After the motorist and his passenger were placed in a squad car, a search of the passenger compartment at the scene of the arrest revealed a small portable locked safe. A police officer opened the safe without obtaining a search warrant and discovered additional marijuana, drug paraphernalia, and a gun. The motorist was charged with possession of marijuana with intent to deliver, failure to affix a drug tax stamp, and knowingly transporting a revolver in a vehicle. The district court denied the motorist's motion to suppress the contents of the locked container under the Federal and State Constitutions and convicted the motorist of the charges. Upon our review, we conclude the warrantless search of the container incident to the motorist's arrest violated his rights under article I, section 8 of the Iowa Constitution.

## I. Background Facts and Proceedings.

On December 18, 2012, while on second shift patrol, a Davenport police officer observed a van moving on the roadway with expired Iowa license plates. The officer initiated a traffic stop. As he approached the van, the officer noticed a very strong odor of burnt marijuana emanating from the vehicle. The driver of the van identified himself as Jesse Gaskins, and a passenger in the front seat of the vehicle could not produce identification.

The officer asked Gaskins about the odor of burnt marijuana. Gaskins denied there was any marijuana in the vehicle. Suspecting Gaskins's answer was untrue, the officer replied that a drug detection

dog was on duty that night and that if it were brought to the scene it would detect that the vehicle *did* contain marijuana. Upon hearing about the prospect of summoning a drug dog, Gaskins said, "Okay, I'll be honest with you, I got a blunt." He retrieved a partially-smoked marijuana blunt from the van's ashtray and gave it to the officer. Because there were two van occupants, the officer requested a second police unit be dispatched to the scene. When a second officer arrived, the officers directed Gaskins and his passenger to exit the van. The officer who initially made the stop immediately arrested Gaskins and secured him inside a police car with his passenger.

Based on his interactions with Gaskins—particularly the fact that Gaskins had initially lied about whether there was marijuana in the vehicle—the arresting officer believed the vehicle contained more marijuana than the blunt Gaskins had retrieved. He therefore directed the second officer to conduct a search of the van to look for additional drugs, paraphernalia, drug packaging materials, weapons, or "[a]nything that was illegal."

The second officer began conducting the search of the van and discovered a small black portable safe between the driver's seat and the rear passenger seats. The safe was locked. The officer found a key to the safe's lock on the keyring in the van's ignition and used it to open the safe. He did not think about getting a warrant before opening the safe, and later testified he considered it the same as if he had found a zipped duffel bag or any other closed container while searching the van.[1] Inside the safe, he found a loaded handgun with a defaced serial number,

---

[1]The searching officer testified he only opened the safe because he found the key. If he had not found the key, he stated he would have informed the arresting officer and "discussed it with him to see what [they] would have to [do]."

several baggies of raw marijuana, several pipes, and some large plastic freezer bags that smelled of marijuana. The vehicle was inventoried, towed, and impounded.

On April 3, 2013, the State charged Gaskins by trial information with three counts: possessing marijuana with intent to deliver, knowingly transporting a revolver in a vehicle, and failing to affix a drug tax stamp.[2] *See* Iowa Code § 124.401(1)(*d*); *id.* § 453B.12; *id.* § 724.4(1) (2011). Gaskins filed a motion to suppress the contents of the safe, asserting "[t]here existed no reason to proceed with the search . . . without a warrant." More specifically, he contended the search was not justified by any threat to the officers' safety or danger that evidence would be destroyed because both occupants of the van had been placed in custody and secured in a squad car away from the van. Gaskins requested the court suppress all evidence removed from the safe because, under both the United States Constitution and the Iowa Constitution, "the [warrantless] search . . . violated his right to privacy in a locked safe."

The State resisted the motion, asserting the warrantless search was a permissible search incident to arrest because it was reasonable to believe the van's passenger compartment contained evidence of the offense—marijuana possession—for which Gaskins was arrested. *See Arizona v. Gant,* 556 U.S. 332, 351, 129 S. Ct. 1710, 1723–24, 173 L. Ed. 2d 485, 501 (2009) ("Police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest."). The State

---

[2]Gaskins's passenger—a minor—was released to his mother and was not charged as a consequence of the incident.

did not assert that any other theory or exception to the warrant requirement justified the warrantless search the officers performed.

At the suppression hearing, the State contended the locked safe was no different from a duffel bag, a backpack, or any other kind of container encountered during the search of a vehicle. Further, the State asserted the fact the key was on Gaskins's keyring indicated he had access to the safe. Gaskins responded that the locked safe was quite different from duffel bags or backpacks because it was *locked*, not merely closed, clearly manifesting his expectation of privacy in its contents. The district court denied Gaskins's motion, concluding the search was a valid search incident to arrest. The district court did not decide whether any other exceptions to the warrant requirement supported the search because the State expressly argued only that the search was valid because it was incident to arrest.[3]

Gaskins was convicted on all three counts following a bench trial on the minutes of testimony. Gaskins appealed, and we retained the appeal.

---

[3]The officers' testimony and the county attorney's legal argument presented at the suppression hearing confirm the focus on the search-incident-to-arrest exception to the warrant requirement. The arresting officer testified about the nature of the van's passenger compartment, stating the vehicle had no separate trunk compartment. Further, the searching officer testified the safe was possibly within the reach of anyone sitting in the driver's seat. The scope of the passenger compartment and the question whether an object was within reaching distance of an arrestee are key factors in analyzing challenges to warrantless searches made incident to arrest. *See Gant*, 556 U.S. at 339, 129 S. Ct. at 1716, 173 L. Ed. 2d at 493 ("If there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search, both justifications for the search-incident-to-arrest exception are absent and the rule does not apply."); *State v. Olsen*, 315 N.W.2d 1, 5 (Iowa 1982) (concluding the search-incident-to-arrest exception cannot authorize officers to search a vehicle's trunk because the trunk is neither the passenger compartment nor within reaching distance of any occupant). Additionally, while presenting legal argument after all testimony had been submitted, the county attorney twice stated, unequivocally, that the search clearly fell into the search-incident-to-arrest exception and did not assert any other exception to the warrant requirement justified the search in this case.

## II. The Parties' Positions.

Gaskins asserts the warrantless search of his locked safe violated his constitutional rights under the Fourth Amendment to the United States Constitution and under article I, section 8 of the Iowa Constitution. In particular, Gaskins contends the search was not justified by officer safety concerns or by a danger that the safe or its contents could be destroyed under the circumstances presented here because the van's occupants had been removed from the vehicle and secured in a squad car.

Alternatively, Gaskins contends trial counsel was ineffective. Specifically, he asserts trial counsel breached an essential duty by not discovering criticism and debate about the soundness of the Supreme Court's holdings in *Gant* and *New York v. Belton,* 453 U.S. 454, 101 S. Ct. 2860, 69 L. Ed. 2d 768 (1981), which delineate the circumstances under which—consistent with the Fourth Amendment—officers may conduct a warrantless search of an automobile and its contents incident to the arrest of an occupant. Gaskins asserts that if trial counsel had uncovered the substantial debate about those cases, he could have crafted a much stronger motion to suppress.

The State asserts that existing federal and state court decisions provide sufficient grounds to affirm the district court's conclusion that the warrantless search in this case was a valid search incident to arrest.

## III. Scope of Review.

"Because this case concerns the constitutional right to be free from unreasonable searches and seizures, our review of the district court's suppression ruling is de novo." *State v. Watts,* 801 N.W.2d 845, 850 (Iowa 2011). "We independently evaluate the totality of the circumstances found in the record, including the evidence introduced at

both the suppression hearing and at trial." *State v. Vance*, 790 N.W.2d 775, 780 (Iowa 2010).

We ordinarily consider ineffective-assistance claims in postconviction-relief proceedings. *Id.* at 785. We only resolve them on direct appeal if the record is adequate to address the claim. *Id.* If the record is adequate, we review ineffective-assistance claims de novo. *State v. Halverson*, 857 N.W.2d 632, 634 (Iowa 2015). When evaluating ineffective-assistance claims, we apply a two-pronged test: we ask whether trial counsel breached an essential duty and whether prejudice resulted from any such breach. *Vance*, 790 N.W.2d at 785; *see Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674, 693 (1984); *Halverson*, 857 N.W.2d at 635.

**IV. Analysis.**

We conclude the search in this case was not a valid search incident to arrest. Accordingly, we do not reach Gaskins's alternative claim that he received ineffective assistance of counsel.

**A. Error Preservation.** Gaskins's motion to suppress raised both the Fourth Amendment of the United States Constitution and article I, section 8 of the Iowa Constitution. At the suppression hearing, Gaskins's counsel spoke generally about exceptions to the warrant requirement, without specifying whether he was referring to the United States Constitution or the Iowa Constitution. The district court's ruling only discusses caselaw—from both this court and the United States Supreme Court—and does not cite either constitution.

The State asserts Gaskins's mere citation to article I, section 8 in the motion did not preserve error based on that provision of the Iowa Constitution because the district court did not rule on it. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental

doctrine of appellate review that issues must ordinarily be raised *and decided* by the district court before we will decide them on appeal." (Emphasis added.)).  However, we have said:

> When there are parallel constitutional provisions in the federal and state constitutions and a party does not indicate the specific constitutional basis, we regard both federal and state constitutional claims as preserved . . . .  Even in these cases in which no substantive distinction had been made between state and federal constitutional provisions, we reserve the right to apply the principles differently under the state constitution compared to its federal counterpart.

*King v. State*, 797 N.W.2d 565, 571 (Iowa 2011) (citations omitted).  We conclude Gaskins preserved his arguments under the Iowa Constitution. *See Lamasters v. State*, 821 N.W.2d 856, 864 (Iowa 2012) ("If the court's ruling indicates that the court *considered* the issue and necessarily ruled on it, even if the court's reasoning is 'incomplete or sparse,' the issue has been preserved." (quoting *Meier*, 641 N.W.2d at 540)); *cf. Vance*, 790 N.W.2d at 780 (confining analysis to the Fourth Amendment because the defendant never raised the Iowa Constitution, even perfunctorily).

**B. Constitutional Provisions and Interpretive Authority.**

Article I, section 8 of the Iowa Constitution provides:

> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable seizures and searches shall not be violated; and no warrant shall issue but on probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the persons and things to be seized.

Iowa Const. art. I, § 8.  This provision "is, of course, *nearly* identical to the Fourth Amendment to the United States Constitution . . . .  [U]nlike accepted versions of the Fourth Amendment, article I, section 8 utilizes a semicolon between the reasonableness clause and the warrant clause." *State v. Short*, 851 N.W.2d 474, 500–01 (Iowa 2014).  Members of this court have disagreed about the semicolon's significance.  On one hand,

some have suggested "[t]he semicolon suggests the framers believed that there was a relationship between the reasonableness clause and the warrant clause." *Id.* at 483. Others believe it may simply be an "inconsequential punctuation difference." *Id.* at 522 (Mansfield, J., dissenting).

We do not revisit that debate here. Even "in . . . cases in which no *substantive* distinction [appears] between state and federal constitutional provisions, we reserve the right to apply the principles differently under the state constitution compared to its federal counterpart." *King*, 797 N.W.2d at 571 (emphasis added); *accord Short*, 851 N.W.2d at 491 (majority opinion); *State v. Kooima*, 833 N.W.2d 202, 206 (Iowa 2013); *see also State v. Roth*, 305 N.W.2d 501, 510–11 (Iowa 1981) (McCormick, J., dissenting) ("Iowa has a proud tradition of concern for individual rights. We should not be reluctant to show greater sensitivity to the rights of Iowans under our constitution than the Supreme Court accords to their rights under the Federal Constitution."); *State v. Eckel*, 888 A.2d 1266, 1275 (N.J. 2006) ("Although [Article I, Paragraph 7 of the New Jersey Constitution] is almost identical to the text of the Fourth Amendment to the Federal Constitution, we have not hesitated . . . to afford our citizens greater protection against unreasonable searches and seizures under Article I, Paragraph 7 than would be the case under its federal counterpart.").

Of course, "our independent authority to construe the Iowa Constitution does not mean that we generally refuse to follow the United States Supreme Court decisions." *Short*, 851 N.W.2d at 490. Rather, it merely assures that we "exercise . . . our best, independent judgment of the proper parameters of state constitutional commands," as we are constitutionally required to do. *Id.*; *see also State v. James*, 393 N.W.2d

465, 468 (Iowa 1986) (Lavorato, J., dissenting) ("We push aside our constitutional responsibilities when we merely look to the Supreme Court for answers in examining the state constitution.").[4]  As the New Jersey Supreme Court has explained:

> [A]lthough th[e Supreme] Court may be a polestar that guides us as we navigate the New Jersey Constitution, we bear ultimate responsibility for the safe passage of our ship. Our eyes must not be so fixed on that star that we risk the welfare of our passengers on the shoals of constitutional doctrine.  In interpreting the New Jersey Constitution, we must look in front of us as well as above us.

*State v. Hempele*, 576 A.2d 793, 800 (N.J. 1990); *accord State v. Hernandez*, 410 So. 2d 1381, 1385 (La. 1982) ("We . . . give careful consideration to the United States Supreme Court interpretations of relevant provisions of the federal constitution, but we cannot and should not allow those decisions to replace our independent judgment in construing the constitution adopted by the people of Louisana."); *State v. Rowell*, 188 P.3d 95, 99–100 (N.M. 2008) ("We are careful to consider the reasoning underlying federal constitutional interpretations when construing our own New Mexico Constitution, but we have declined to adopt federal constitutional analysis where we found it unpersuasive or flawed."); *see also Parker v. Commonwealth*, 440 S.W.3d 381, 388 (Ky. 2014) (stressing that, although the state rule and federal rule were coterminous, "when interpreting our own Kentucky Constitution, th[e] Court is not tethered to the decisions of the U.S. Supreme Court or the reasoning upon which those decisions are founded").

---

[4]The State urges adoption of "neutral interpretive principles" or "divergence criteria" for deciding when this court will rely on independent state grounds for its decisions.  We recently addressed and rejected the notion of such criteria in *Short,* and do so again here.  *See Short,* 851 N.W.2d at 490–91.

**C. The Search in This Case.** Police searched Gaskins's vehicle and opened the safe without a warrant. "A warrantless search is presumed unreasonable" unless an exception applies. *State v. Moriarty*, 566 N.W.2d 866, 868 (Iowa 1997); *accord State v. Allensworth*, 748 N.W.2d 789, 792 (Iowa 2008); *State v. Tolsdorf*, 574 N.W.2d 290, 292 (Iowa 1998). The only exception to the warrant requirement litigated in the district court—and thus the only one at issue in this appeal—is search incident to arrest (SITA). *See Vance*, 790 N.W.2d at 786–87. "The [SITA] exception derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations." *Gant*, 556 U.S. at 338, 129 S. Ct. at 1716, 173 L. Ed. 2d at 493. Importantly, however, "[t]he [SITA] exception to the warrant requirement must be narrowly construed and limited to accommodating only those interests it was created to serve." *State v. McGrane*, 733 N.W.2d 671, 677 (Iowa 2007); *accord Vance*, 790 N.W.2d at 786–87; *State v. Sterndale*, 656 A.2d 409, 410 (N.H. 1995) (noting the proper scope of a SITA "is limited by the exception's very specific justifications"); *State v. Valdez*, 224 P.3d 751, 758–59 (Wash. 2009) ("The [SITA] exception . . . arises from the necessity to provide for officer safety and the preservation of evidence of the crime of arrest, and the application and scope of that exception must be so grounded and so limited.").

The seminal decision exploring the SITA exception to the warrant requirement is *Chimel v. California*, 395 U.S. 752, 762–63, 89 S. Ct. 2034, 2040, 23 L. Ed. 2d 685, 693–94 (1969). *Chimel* did not involve the search of a vehicle; rather, police arrested the defendant in his home and "then looked through the entire three-bedroom house, including the attic, the garage, and a small workshop." *Id.* at 754, 89 S. Ct. at 2035,

23 L. Ed. 2d at 688. The Supreme Court explained the search's wide sweep rendered it constitutionally invalid:

> There is ample justification . . . for a search of the arrestee's person and the area "within his immediate control"—construing that phrase to mean the area from which he might gain possession of a weapon or destructible evidence.
>
> There is no comparable justification, however, for routinely searching any room other than that in which an arrest occurs—or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself. Such searches, in the absence of well-recognized exceptions, may be made only under the authority of a search warrant.

*Id.* at 763, 89 S. Ct. at 2040, 23 L. Ed. 2d at 694. In short, the Court confirmed that allowing officers to perform a SITA of a limited area "serve[s] the dual purposes of protecting arresting officers and safeguarding any evidence the arrestee may seek to conceal or destroy." *Vance*, 790 N.W.2d at 786; *see Chimel*, 395 U.S. at 768, 89 S. Ct. at 2043, 23 L. Ed. 2d at 697.

In *Belton*, the Supreme Court confronted the question of the extent to which the *Chimel* principles should apply in adjudicating a Fourth Amendment challenge to the search of an automobile conducted incident to the arrest of an occupant. *See Belton*, 453 U.S. at 459, 101 S. Ct. at 2863, 69 L. Ed. 2d at 774 (stating the question in that case was "the proper scope of a search of the interior of an automobile incident to a lawful custodial arrest of its occupants"). An officer pulled a car over for speeding and Belton was a passenger in the car. *Id.* at 455, 101 S. Ct. at 2861, 69 L. Ed. 2d at 772. When the officer approached the car, he "smelled burnt marihuana and [saw] on the floor of the car an envelope marked 'Supergold' that he associated with marihuana." *Id.* at 455–56, 101 S. Ct. at 2862, 69 L. Ed. 2d at 772. He arrested the car's occupants

for possession of marijuana and "then searched the passenger compartment of the car. On the back seat he found a black leather jacket belonging to Belton," and upon opening a zipped jacket pocket he discovered cocaine. *Id.* at 456, 101 S. Ct. at 2862, 69 L. Ed. 2d at 772. Belton moved to suppress the cocaine on the ground that the warrantless search violated his rights under the Fourth Amendment. *Id.*

The Court held that "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." *Id.* at 460, 101 S. Ct. at 2864, 69 L. Ed. 2d at 775. The Court based its conclusion on the notion that the entire passenger compartment is "generally, even if not inevitably, within 'the area into which an arrestee might reach.' " *Id.* (quoting *Chimel*, 395 U.S. at 763, 89 S. Ct. at 2040, 23 L. Ed. 2d at 694). *But see id.* at 466, 101 S. Ct. at 2867, 69 L. Ed. 2d at 779 (Brennan, J., dissenting) (characterizing this assumption as "fiction"). Further, the Court concluded that incident to a lawful arrest "the police may also examine the contents of any containers found within the passenger compartment." *Id.* at 460, 101 S. Ct. at 2864, 69 L. Ed. 2d at 775 (majority opinion).

We adopted *Belton* in 1981. *State v. Sanders*, 312 N.W.2d 534, 539 (Iowa 1981) ("[W]e believe *Belton* strikes a reasonably fair balance between the rights of the individual and those of society. We adopt it now as our rule."). However, *Belton* soon became the subject of significant criticism. *See Vance*, 790 N.W.2d at 787–88 (collecting commentary along with caselaw from multiple states rejecting *Belton*); *Eckel*, 888 A.2d at 1272–73 ("[T]he drumbeat of scholarly opposition to *Belton* has remained constant."); *see also, e.g.,* Wayne R. LaFave, *The*

*Fourth Amendment in an Imperfect World: On Drawing "Bright Lines" and "Good Faith"*, 43 U. Pitt. L. Rev. 307, 332 (1982) ("[T]here is good reason to be critical of the Court's work in *Belton.*"); Eugene L. Shapiro, New York v. Belton *and State Constitutional Doctrine*, 105 W. Va. L. Rev. 131, 137 (2002) ("Criticism of *Belton* has been vigorous and sustained."). So, "[a]lthough *Sanders* held Iowa's constitutional doctrine was the same as *Belton, Sanders* was decided before the criticism of *Belton* began." *Vance*, 790 N.W.2d at 789.

Some members of the Supreme Court became wary of *Belton*'s breadth. In 2004, Justice Sandra Day O'Connor expressed concern that, after *Belton*, "lower court decisions seem[ed] . . . to treat the ability to search a vehicle incident to the arrest of a recent occupant as a police entitlement rather than as an exception [to the warrant requirement]." *Thornton v. United States*, 541 U.S. 615, 624, 124 S. Ct. 2127, 2133, 158 L. Ed. 2d 905, 915 (2004) (O'Connor, J., concurring in part). Justice Antonin Scalia echoed that concern. *Id.* at 627, 124 S. Ct. at 2134, 158 L. Ed. 2d at 917 (Scalia, J., concurring in the judgment) ("[C]onducting a [SITA] is not the Government's right; it is an exception—justified by necessity—to a rule that would otherwise render the search unlawful."). Justice Scalia also noted the justification for a warrantless SITA—"to find weapons the arrestee might use or evidence he might conceal or destroy"—is much weaker when a defendant is "handcuffed and secured in the back of the officer's squad car." *Id.* at 625, 124 S. Ct. at 2133, 158 L. Ed. 2d at 915–16.

Critical commentary on *Belton* culminated at the Supreme Court in 2009. *Gant*, 556 U.S. at 350–51, 129 S. Ct. at 1723–24, 173 L. Ed. 2d at 501. In *Gant*, officers arrested the defendant for driving with a suspended license, and while he was handcuffed in a patrol car, the

officers "searched his car and discovered cocaine in the pocket of a jacket on the backseat." *Id.* at 335, 129 S. Ct. at 1714, 173 L. Ed. 2d at 491. The *Gant* Court acknowledged that its decision in *Belton* had produced untoward consequences, noting:

> The experience of the 28 years since we decided *Belton* has shown that the generalization underpinning the broad reading of that decision is unfounded. We now know that articles inside the passenger compartment are rarely within the area into which an arrestee might reach, and blind adherence to *Belton*'s faulty assumption would authorize myriad unconstitutional searches.

*Id.* at 350–51, 129 S. Ct. at 1723, 173 L. Ed. 2d at 501 (citations omitted) (internal quotation marks omitted). Further, the Court noted the testimony of the officer who conducted the warrantless search in *Gant* manifested the very concern several justices had raised in *Thornton*: that police had come to view vehicle searches as an entitlement, not an exception. *Id.* at 336–37, 129 S. Ct. at 1715, 173 L. Ed. 2d at 492 ("When asked . . . why the search was conducted, [the officer] responded: 'Because the law says we can do it.' ").

*Gant* limited, but did not completely disavow, *Belton*. *See id.* at 345–46, 129 S. Ct. at 1720–21, 173 L. Ed. 2d at 497–98 (rejecting a reading of *Belton*, not *Belton* itself). In particular, the Court limited the circumstances in which a warrantless search of a vehicle incident to arrest is permitted, because holding otherwise would fail to address "the concern about giving police officers unbridled discretion to rummage at will among a person's private effects." *Id.* at 345, 129 S. Ct. at 1720, 173 L. Ed. 2d at 497. Thus, the holding in *Gant* authorizes officers to search a suspect's vehicle incident to the suspect's arrest "only if the arrestee is within reaching distance of the passenger compartment at the time of the search *or* it is reasonable to believe the vehicle contains evidence of the

offense of arrest." *Id.* at 351, 129 S. Ct. at 1723, 173 L. Ed. 2d at 501 (emphasis added). In effect, *Gant* added a third justification under the Fourth Amendment for searching an automobile incident to the arrest of a recent occupant: a "more general sort of evidence-gathering" pertaining to the crime of arrest. *Thornton,* 541 U.S. at 629, 124 S. Ct. at 2135, 158 L. Ed. 2d at 918; *see Gant,* 556 U.S. at 343, 129 S. Ct. at 1719, 173 L. Ed. 2d at 496 (noting the evidence-gathering rationale "does not follow from *Chimel*").

Although the Supreme Court heard numerous calls to revisit *Belton,* it did not do so until the *Gant* decision in 2009. *See Vance,* 790 N.W.2d at 787–88 (tracing the history of criticism); *see also Gant,* 556 U.S. at 350–51, 129 S. Ct. at 1723–24, 173 L. Ed. 2d at 501. Similarly, since the Supreme Court decided *Gant* in 2009, we have not had occasion until today to decide whether the protection against warrantless searches and seizures incident to arrest offered by article I, section 8 of the Iowa Constitution conforms to the rule announced in *Gant.* Indeed, our decisions have cited *Gant* only twice, and in those cases, it was tangential to the resolution of the issue before us. *Vance,* 790 N.W.2d at 789–90 (acknowledging *Gant* limited *Belton* and mentioning *Gant* in the context of a defendant's claim that his counsel was ineffective for failing to research or discover criticism of *Belton,* but ultimately declining to rule on the ineffective-assistance claim); *see also State v. Baldon,* 829 N.W.2d 785, 819 (Iowa 2013) (Appel, J., specially concurring) (citing *Gant* as an example of the United States Supreme Court recognizing and adopting principles from state constitutional jurisprudence). And just as the Supreme Court revisited the rule previously announced in *Belton,* we are free to revisit our prior decisions and determine whether the Iowa Constitution demands a different standard of protection against

warrantless searches incident to arrest. This case presents that opportunity.

Applying the rule in *Belton,* we concluded the dual purposes of promoting officer safety and preventing evidence destruction justified a warrantless search even when it occurred "after the arrestee ha[d] been handcuffed and restrained outside the vehicle." *State v. Edgington,* 487 N.W.2d 675, 677 (Iowa 1992); *see Sanders,* 312 N.W.2d at 537, 539. Courts in some other states reached the same conclusion in lockstep with *Belton. See, e.g., Stout v. State,* 898 S.W.2d 457, 459–60 (Ark. 1995) (adopting *Belton* under the Arkansas Constitution and upholding a warrantless search of an automobile incident to the arrest conducted after the defendant was handcuffed and standing on the side of the highway); *State v. Delossantos,* 559 A.2d 164, 168 (Conn. 1989) ("We hold that when police make a lawful custodial arrest of an occupant of an automobile, and the arrestee is detained at the scene, police may contemporaneously search without a warrant the interior passenger compartment of the automobile."); *State v. Charpentier,* 962 P.2d 1033, 1034–35, 1037 (Idaho 1998) (adopting *Belton* under the Idaho Constitution and applying it in upholding a warrantless search of an automobile conducted after the defendant was handcuffed and placed in the patrol car); *State v. Rice,* 327 N.W.2d 128, 130–31 (S.D. 1982) (applying *Belton* and upholding a search even though the defendant "was not in a position to . . . reach a weapon or remove evidence at the time of the search"). But all these state court decisions—including our own—relied on *Belton*'s "faulty assumption" that the entire passenger compartment of a vehicle is always within an occupant's reach. *Gant,* 556 U.S. at 350–51, 129 S. Ct. at 1723, 173 L. Ed. 2d at 501; *see Belton,* 453 U.S. at 460, 101 S. Ct. at 2864, 69 L. Ed. 2d at 775. And in *Gant,*

the Court specifically repudiated that assumption, calling it an unfounded generalization that might "authorize myriad unconstitutional searches." *Gant,* 556 U.S. at 350–51, 129 S. Ct. at 1723, 173 L. Ed. 2d at 501.

In contrast to the group of states that adopted and followed *Belton* in interpreting their state constitutions, several others have departed from *Belton,* focusing on the specific and narrow *Chimel* considerations underpinning the SITA exception to the warrant requirement. For example, in *Eckel,* the New Jersey Supreme Court stated:

> Because the [SITA] exception to the warrant requirement was lim[it]ed for two specific purposes—the protection of the police and the preservation of evidence—and because neither purpose can be advanced by searching the vehicle of a person who effectively is incapacitated, we hold that such a search is incompatible with . . . the New Jersey Constitution. To the extent [*Belton*] has concluded otherwise in [interpreting] the Federal Constitution, we respectfully part company with the United States Supreme Court.

*Eckel,* 888 A.2d at 1266. The New Jersey court rejected *Belton* because *Belton* wrote "out of the [SITA] exception the two *Chimel* justifications . . . [and] reached a result that is detached from established Fourth Amendment jurisprudence." *Id.* at 1277. Accordingly, the court held that "[o]nce the occupant of a vehicle has been arrested, removed and secured elsewhere, the considerations informing the search incident to arrest exception are absent and the exception is inapplicable." *Id.*

Similarly, the Washington Supreme Court has held that a warrantless search of a locked container found in an automobile incident to the arrest of an occupant is only permissible under that state's constitution to "preserve officer safety or prevent destruction or concealment of evidence of the crime of arrest." *Valdez,* 224 P.3d at 759. In other words, warrantless searches of locked containers incident to the

arrest of an occupant of a vehicle are permitted under the Washington Constitution only where *Chimel* would allow them. *Compare id., with Chimel,* 395 U.S. at 768, 89 S. Ct. at 2043, 23 L. Ed. 2d at 697. If "officers have the opportunity to prevent the individual's access to the contents of [a] container so that officer safety or the preservation of evidence of the crime of arrest is not at risk, there is no justification under the [SITA] exception to permit a warrantless search of [a] locked container." *Valdez,* 224 P.3d at 759. As the defendant in *Valdez* had no access to his vehicle at the time of the search of his locked container because he was handcuffed and secured in a patrol car, the "evidence gathered during that search [wa]s therefore inadmissible." *Id.* at 753, 760.

The New Hampshire Supreme Court has also departed from *Belton* in interpreting that state's constitution. *See Sterndale,* 656 A.2d at 409–10. After an officer stopped Sterndale for speeding, the officer detected the smell of burnt marijuana emanating from the vehicle. Sterndale "admitted that she had just smoked a 'joint,' or marijuana cigarette." *Id.* at 410. The officer handcuffed the defendant, placed her in his cruiser, returned to her car, and opened a brown paper bag, in which he found additional marijuana. *Id.* The court held the search was not a valid SITA under the New Hampshire Constitution:

> In the instant case, the defendant was secured, in handcuffs, in the rear of a police cruiser, with two Nashua Police officers on the scene. . . . [T]he legitimate law-enforcement concerns underlying the [SITA] exception plainly were not present in this case. Since the search was made only after the defendant was securely in custody and unable to gain access to the vehicle, it was not justifiable as a search incident to arrest.

*Id.*

Several other courts have focused on the *Chimel* considerations in declining to follow *Belton* when interpreting their states' constitutions. *See, e.g., Hernandez,* 410 So. 2d at 1385 ("[T]he *Belton* rule can have no application after an arrestee has been handcuffed and removed from the scene, foreclosing even the slightest possibility that he could reach for an article within the vehicle."); *Rowell,* 188 P.3d at 101 ("There simply was no reasonable basis for concluding that this handcuffed defendant locked inside a patrol car was in any position to escape and get to the contents of his own car to gain access to any weapons or evidence."); *State v. Pittman,* 127 P.3d 1116, 1121 (N.M. Ct. App. 2005) ("[W]e hold that even after a valid arrest, one of *Chimel*'s two rationales must be present before an officer may search a vehicle without a warrant."), *cert. quashed,* 152 P.3d 152 (N.M. 2007); *Commonwealth v. White,* 669 A.2d 896, 902 & n.6 (Pa. 1995); *State v. Bauder,* 924 A.2d 38, 47 (Vt. 2007) (rejecting *Belton* "in favor of the traditional rule" because "no persuasive evidence or argument [wa]s offered to demonstrate how defendant—handcuffed in the back seat of the police cruiser—or his passenger who had left the scene, presented any form of threat").

We now agree with the approach taken by the courts that have rejected the *Belton* rule that authorized warrantless searches of containers without regard to the *Chimel* considerations of officer safety and protecting evidence. "When lines need to be drawn in creating rules, they should be drawn thoughtfully along the logical contours of the rationales giving rise to the rules, and not as artificial lines drawn elsewhere that are unrelated to those rationales." *Rowell,* 188 P.3d at 101; *see also Valdez,* 224 P.3d at 758 (reminding readers of "the danger of wandering from the narrow principled justifications of the [SITA] exception, even if such wandering is done an inch at a time").

Ostensibly, *Gant* is a limitation on *Belton*. *See Vance,* 790 N.W.2d at 788 ("[*Gant*] rejected the broad interpretation of *Belton* and tethered *Belton*'s bright-line rule to the dual purposes underlying the search-incident-to-arrest exception as recognized in *Chimel*."). But *Gant* also recognized an additional purpose authorizing officers to invoke the SITA exception and conduct a warrantless search of the auto and containers within it under the Fourth Amendment if "it is reasonable to believe the vehicle contains evidence of the offense of arrest." *Gant,* 556 U.S. at 351, 129 S. Ct. at 1723, 173 L. Ed. 2d at 501. This additional purpose stands wholly separate from the justifications originally underlying the SITA exception. *See id.* at 343, 129 S. Ct. at 1719, 173 L. Ed. 2d at 496.

We approve *Gant*'s "reaching distance" rationale as an appropriate limitation on the scope of searches incident to arrest under article I, section 8 of the Iowa Constitution because that limitation is faithful to the underlying justifications for warrantless searches incident to arrest. However, we decline to adopt *Gant*'s alternative evidence-gathering rationale for warrantless searches incident to arrest under the Iowa Constitution because it would permit the SITA exception to swallow completely the fundamental textual rule in article I, section 8 that searches and seizures should be supported by a warrant. In other words, "use of a [SITA] rationale to sanction a warrantless search that has nothing to do with its underlying justification—preventing the arrestee from gaining access to weapons or evidence—is an anomaly." *Rowell,* 188 P.3d at 100; *see also State v. Snapp,* 275 P.3d 289, 301 (Wash. 2012) (declining to adopt the evidence-gathering rationale under the state constitution). Although the evidence-gathering rationale announced in *Gant* limits the propriety of a warrantless search of an automobile and containers found within it incident to arrest to those

instances when it is reasonable to believe the vehicle contains evidence of the crime of arrest, construing the exception this broadly "would serve no purpose except to provide a police entitlement." *Gant,* 556 U.S. at 347, 129 S. Ct. at 1721, 173 L. Ed. 2d at 499. Police entitlements are incompatible with Iowans' robust privacy rights. *See, e.g., Short,* 851 N.W.2d at 507 (Cady, C.J., concurring specially) ("[W]e cannot ignore that our history of robust protection of human rights owes in no small part to our authority within America's federalist system to independently interpret our constitution."); *Baldon,* 829 N.W.2d at 803 (holding a consent provision in a parole agreement does not voluntarily waive constitutional search and seizure protection under the Iowa Constitution); *State v. Pals,* 805 N.W.2d 767, 782–83 (Iowa 2011) (concluding consent to search obtained during a traffic stop was invalid because traffic stops are inherently coercive); *State v. Ochoa,* 792 N.W.2d 260, 291 (Iowa 2010) (finding invalid a search that "too closely resemble[d] authority pursuant to a general warrant").

In declining to adopt *Gant*'s broad evidence-gathering purpose as a rationale for warrantless searches of automobiles and their contents incident to arrest under article I, section 8 of the Iowa Constitution, we note the historical precedent upon which that rationale relies was specifically rejected in *Chimel. See Chimel,* 395 U.S. at 768, 89 S. Ct. at 2042–43, 23 L. Ed. 2d at 696–97; *see also Gant,* 556 U.S. at 343–44, 129 S. Ct. at 1719, 173 L. Ed. 2d at 496 (relying on Justice Scalia's concurrence in *Thornton* in formulating the evidence-gathering rationale); *Thornton,* 541 U.S. at 629, 124 S. Ct. at 2135–36, 158 L. Ed. 2d at 918 (Scalia, J., concurring in the judgment) (collecting cases). We conclude the SITA exception to the warrant requirement under article I, section 8 of the Iowa Constitution is justified by the State's interest in preserving

evidence from destruction, not merely collecting it expediently. *Cf. State v. Tibbles*, 236 P.3d 885, 889 (Wash. 2010) (en banc) ("[W]hatever relative convenience to law enforcement may obtain from forgoing the burden of seeking a warrant . . . , we adhere to the view that 'mere convenience is simply not enough.' " (quoting *State v. Patterson*, 774 P.2d 10, 12 (Wash. 1989))).

Indeed, the important distinction between the purpose of preserving evidence and the purpose of collecting evidence in SITA analysis was evident even before *Chimel* as the Supreme Court demonstrated a desire to constrain the scope of the SITA exception under the Fourth Amendment. *Preston v. United States*, 376 U.S. 364, 367–68, 84 S. Ct. 881, 883–84, 11 L. Ed. 2d 777, 780–81 (1964). While recognizing the general parameters of the SITA exception, the Court noted "these justifications are absent where a search is remote in time or place from the arrest." *Id.* at 367, 84 S. Ct. at 883, 11 L. Ed. 2d at 780. When a vehicle search "was not undertaken until [defendant] . . . had been arrested and taken in custody," there "was no danger that [he] could have used any weapons in the car or could have destroyed any evidence of a crime." *Id.* at 368, 84 S. Ct. at 883, 11 L. Ed. 2d at 781. The search performed without a warrant was "simply not incident to the arrest." *Id.* at 367, 84 S. Ct. at 883, 11 L. Ed. 2d at 780–81. We conclude the Court's rationale in *Preston* further supports our determination that the *Gant* evidence-gathering rationale is divorced from the underlying SITA justifications and is repugnant to article I, section 8 of the Iowa Constitution.

Applying these principles to the facts of this case, we conclude the search of Gaskins's locked safe was not a valid SITA under article I, section 8. Two police officers were on the scene. Although the van had

two occupants, both Gaskins and his passenger were secured in a squad car before the search of the vehicle and the safe were undertaken. The officer who performed the search testified there was no way Gaskins could have retrieved anything from the locked safe while in custody in the squad car. *See Pittman,* 127 P.3d at 1122 ("Handcuffed and secured in the patrol car, Defendant had no realistic opportunity to escape, wrestle the car keys from the officer, rush over to his locked car, unlock the door, and seize the weapon from under the seat."); *see also Rose v. Commonwealth,* 322 S.W.3d 76, 80 (Ky. 2010) (finding a search of a vehicle incident to the occupant's arrest unreasonable when the occupant was secured in a police cruiser because "there was no possibility [the occupant] could have gained access to the vehicle to destroy evidence or access a weapon"); *Camacho v. State,* 75 P.3d 370, 374 (Nev. 2003) (concluding when a defendant was arrested and placed in handcuffs, it was "extremely unlikely" he could have "reached a weapon in his vehicle or destroyed or concealed evidence in his vehicle"). The officers' safety was not endangered, and Gaskins could only have reached the vehicle to destroy evidence if he had "the skill of Houdini and the strength of Hercules." *United States v. Frick,* 490 F.2d 666, 673 (5th Cir. 1973) (Goldberg, J., concurring in part and dissenting in part). We decline to attribute these mythical qualities to Gaskins.

Because we conclude the search was not a valid SITA under article I, section 8 of the Iowa Constitution, the safe's locked status does not control our decision. *See Perez v. People,* 231 P.3d 957, 962 (Colo. 2010) ("[A] container cannot be accessed if the vehicle containing it cannot be searched . . . ."). We acknowledge that some other courts have concluded officers can open locked containers during a SITA. *See, e.g., United States v. Vinton,* 594 F.3d 14, 26 (D.C. Cir. 2010) (briefcase);

*United States v. Thomas*, 11 F.3d 620, 624–25, 628 (6th Cir. 1993) (safe); *United States v. McCrady*, 774 F.2d 868, 871–72 (8th Cir. 1985) (glove compartment); *People v. Tripp*, 715 N.E.2d 689, 698 (Ill. App. Ct. 1999) (footlocker); *Pack v. Commonwealth*, 368 S.E.2d 921, 923 (Va. Ct. App. 1988) (luggage). But if we focused here on the fact the safe was locked, we would be considering only a very narrow spatial question while presuming the officers could permissibly search the van under the SITA exception to article I, section 8 once Gaskins and his passenger were secured. This we decline to do.

Although we reject *Gant*'s evidence-gathering rationale for warrantless searches incident to arrest under the Iowa Constitution, we of course do not reject the SITA exception entirely. Our decision today does not preclude a warrantless SITA under circumstances in which the security of an arresting officer is implicated, *see Tolsdorf*, 574 N.W.2d at 291, or when the vehicle may reasonably be suspected to contain volatile chemicals, *see State v. Ferguson*, 128 P.3d 1271, 1275 (Wash. Ct. App. 2006), or when the arrested person is within reach of contraband and thus able to attempt to destroy or conceal it. We leave for another day any questions related to these or similar scenarios in which the dual purposes of the SITA exception are supported in the record.

We are sensitive to the State's policy concerns, but we conclude they do not justify the warrantless search incident to arrest in this case. For example, the State contends obtaining a warrant in the field is not an instantaneous proposition, especially when—as in this case—a traffic stop occurs at a late hour, making it less convenient to approach a magistrate and request a warrant immediately. We acknowledge the officers likely would not have obtained a search warrant instantaneously, had they requested one. Yet, any inconvenience resulting from the need

to request and obtain a search warrant at the late hour does not defeat the protection offered by article I, section 8 because

> constitutional protections do not simply fade away with the setting of the sun. The prohibition against unreasonable searches safeguards people . . . at all times. We cannot conclude that the validity of a warrantless search could turn solely on the time of day that search was conducted.

*State v. Elison*, 14 P.3d 456, 471 (Mont. 2000).

Nonetheless, the State continues, a child could have gained access to the drugs and the gun in Gaskins's vehicle had it been left unattended on a Davenport street while officers obtained a warrant. Further, the State asserts a warrant requirement in this instance puts a strain on police resources, because one officer would have to stay with the vehicle while another traveled to get the magistrate's approval. However, these concerns are premised on the notion the vehicle would remain on the street. Because it was impounded, both of these dangers are more imaginary than real.

Lastly, the State contends, the public sees no benefit in exchanging an immediate warrantless search for an impoundment and later search authorized by warrant. We conclude this assertion misses the mark. The protections of article I, section 8 against warrantless searches are not meant to benefit the public generally. They are meant to protect individual citizens and their reasonable expectations of privacy. *See Ochoa*, 792 N.W.2d at 274–75 ("[I]t is clear that the Iowa framers placed considerable value on the sanctity of private property."); *cf. McClurg v. Brenton*, 123 Iowa 368, 371, 98 N.W. 881, 882 (1904) ("The right of *the citizen* to occupy and enjoy his home . . . is embodied in every bill of rights defining the limits of government power in our own republic." (Emphasis added.)). As we explained exactly one hundred years ago:

> [T]he Constitution [is not] a public enemy whom judges are charged to disarm whenever possible. It is the protector of the people, placed on guard by them to save the rights of the people against injury . . . . To hold that attack upon it is for the public good is to commend the soldier for tearing down the rampart which enables him to sleep in safety.

*Hunter v. Colfax Consol. Coal Co.*, 175 Iowa 245, 272, 154 N.W. 1037, 1047 (1915).

In sum, we overrule *Sanders* because we conclude *Belton* no longer sets forth the proper scope of the SITA exception under the Iowa Constitution. Instead, the SITA exception to the warrant requirement under article I, section 8 is tethered to its original underlying dual justifications. When we apply those justifications in this case, we conclude the search of Gaskins's van and safe was not a valid warrantless SITA under the Iowa Constitution because at the time the police officer conducted it there was no danger to the officer or likelihood that Gaskins could access the vehicle to obtain a weapon or destroy evidence. Of course, our holding that the warrantless search of the van was not justified under article I, section 8 as a SITA does not mean the van was immune from search; our holding "is instead that a warrant is generally required before such a search." *Riley v. California*, ___ U.S. ___, ___, 134 S. Ct. 2473, 2493, 189 L. Ed. 2d 430, 451 (2014).

**V. Conclusion.**

"The word 'automobile' is not a talisman in whose presence the [constitutional protection against warrantless searches and seizures] fades away and disappears." *Coolidge v. New Hampshire*, 403 U.S. 443, 461, 91 S. Ct. 2022, 2035, 29 L. Ed. 2d 564, 580 (1971). That sentiment applies with equal force to article I, section 8 of the Iowa Constitution.[5]

---

[5]We are mindful that our recent article I, section 8 decisions have received criticism because they diverge from the Supreme Court's interpretation of the Fourth

Because Gaskins could not access anything inside the vehicle or the locked safe when the search occurred, the search of the safe was not a valid SITA. Accordingly, the State was required to obtain a warrant before searching the van and the safe. Because it did not do so, the district court should have granted Gaskins's motion to suppress. We reverse Gaskins's conviction and remand for proceedings consistent with this opinion.

**REVERSED AND REMANDED.**

Cady, C.J., and Wiggins and Appel, JJ., join this opinion. Cady, C.J., files a separate concurring opinion in which Wiggins, J., joins. Appel, J., files a separate concurring opinion in which Cady, C.J., and Wiggins, J., join. Waterman, J., files a dissenting opinion in which Mansfield and Zager, JJ., join. Zager, J., files a dissenting opinion in which Waterman and Mansfield, JJ., join.

---

Amendment. *See, e.g.*, *Short*, 851 N.W.2d at 515 (Waterman, J., dissenting) ("Revisiting settled precedent whenever four justices of this court find prior cases 'unpersuasive' leads to serious and troubling repercussions."); *Baldon*, 829 N.W.2d at 837 (Mansfield, J., dissenting) ("I have serious concerns about an approach that treats a United States Supreme Court decision as just another dish on the menu."). However, the notion that any departure from precedent is problematic is a non sequitur. The Supreme Court has revised its understanding of the SITA exception over time. *Compare Preston*, 376 U.S. at 367–68, 84 S. Ct. at 883–84, 11 L. Ed. 2d at 781, *with Gant*, 556 U.S. at 350–51, 129 S. Ct. at 1723, 173 L. Ed. 2d at 500–01. Today, we merely do the same. We are not forever confined to the analysis our predecessors undertook, because no supreme court is—nor should it be.

**CADY**, **Chief Justice (concurring specially).**

I concur in the opinion of the majority. All searches must be reasonable, and reasonableness must both justify the search and constrain its scope. *See State v. King*, 867 N.W.2d 106, 124 (Iowa 2015). Under the facts of this case, the justification for permitting a warrantless search incident to arrest does not apply to a locked safe inside an unoccupied vehicle.

Additionally, a recognized exception to the warrant requirement cannot live beyond the life of the justification responsible for its existence. The automobile exception to the warrant requirement was created by the United States Supreme Court ninety years ago during Prohibition. *See Carroll v. United States*, 267 U.S. 132, 153–54, 45 S. Ct. 280, 285, 69 L. Ed. 543, 551 (1925). The justification for the warrantless search was grounded in the practical problems for police of obtaining a search warrant presented by the mobility of a vehicle. *Id.* at 153, 45 S. Ct. at 285, 69 L. Ed. at 551 (noting the vehicle could be moved out of the jurisdiction while the warrant was being sought). The need for the automatic nature of this exigency justification, however, may be affected by the changing technology that is speeding up the warrant process. While a vehicle remains mobile, the Iowa court system is now the first court system in the nation to be totally electronic for all users at all levels. Court users can electronically access courts, and a police officer may soon have the capability to access the court system from the computer in a police vehicle to request a search warrant based on probable cause at all times of the day and night. In the future, warrants will likely be received within a short period of time during the course of a roadside encounter.

An automatic exception to the warrant requirement, particularly one based on exigency, must account for the new world of technology, and must not continue to exist simply because it existed in the past. In some instances, this new world may require movement from an automatic exigency to the standard exigent-circumstances requirement in which the rapid nature of occurrences precluding the wait for a warrant must be explained on a case-by-case basis.

Wiggins, J., joins this special concurrence.

**APPEL, Justice (concurring specially).**

I join the court's opinion in this very sensitive area of state constitutional law involving a traffic stop and a subsequent search.[6] I write separately to explore some of the issues raised in the dissent.

First, I briefly review the merits of the court's opinion regarding the search-incident-to-arrest issue raised in this case. Second, I review the merits of the State's "neutral criteria" approach to state constitutional law proposed by the dissent. Third, in light of the discussion of the neutral criteria, I examine the dissent's treatment of the automobile exception under the Iowa Constitution. Along the way, I contrast the dissent's approach to the state constitutional issue, which I assume applies its neutral criteria, with an approach based on analysis of the fidelity of the automobile exception to the constitutional underpinnings of article I, section 8 of the Iowa Constitution.

---

[6]The consistency of traffic stops with constitutional requirements has been the subject of much contemporary debate in light of the United States Supreme Court's evolving approach. In *Whren v. United States*, the United States Supreme Court held that a citizen could not challenge a traffic stop based upon the subjective views of a police officer. 517 U.S. 806, 813, 116 S. Ct. 1769, 1774, 135 L. Ed. 2d 89, 97–98 (1996). Then, in *Atwater v. City of Lago Vista*, the United States Supreme Court held that a citizen could be arrested for a minor traffic violation. 532 U.S. 318, 354, 121 S. Ct. 1536, 1557, 149 L. Ed. 2d 549, 577 (2001). Because of the scope of arrest power and the difficulty in challenging the validity of an arrest, the search-incident-to-arrest doctrine has become a controversial issue. *See State v. Pals*, 805 N.W.2d 767, 772–73, 775–77 (Iowa 2011); David A. Harris, *The Stories, the Statistics, and the Law: Why "Driving While Black" Matters*, 84 Minn. L. Rev. 265, 312–19 (1999). *See generally* Tracey Maclin, *Race and the Fourth Amendment*, 51 Vand. L. Rev. 333 (1998). The importance of the issues surrounding searches incident to arrest in the context of automobile stops is highlighted by Justice Scalia in *Thornton v. United States*, who observed that such searches are "legion." 541 U.S. 615, 628, 124 S. Ct. 2127, 2135, 158 L. Ed. 2d 905, 917 (2004) (Scalia, J., concurring in the judgment).

## I. Arguments on the Merits of Search Incident to Arrest.

The court's opinion addresses the search-incident-to-arrest issue under article I, section 8 of the Iowa Constitution with thoroughness and precision. It is a model of scholarship and clear writing. And, it is wholly loyal to basic principles of search and seizure law under article I, section 8 of the Iowa Constitution. I write separately on the search-incident-to-arrest issue only to make a few points.

To the extent the dissent relies on "inconvenience," there is, of course, a degree of inconvenience in requiring a warrant in this case. That much must be conceded. In fact, the warrant requirements of article I, section 8 of the Iowa Constitution generally are inconvenient provisions. If inconvenience were enough to defeat the assertion of constitutional rights, however, the warrant requirement would be meaningless, as would all the other inconvenient provisions in article I of the Iowa Constitution, such as the right to speedy trial, the right to be informed of the accusation, the right to confront witnesses, the right to compulsory process, and the right to have the assistance of counsel. Iowa Const. art. I, § 10.

The very purpose of constitutional provisions, however, is to prevent current practical considerations from eviscerating "inalienable" constitutional rights. *Id.* art. I, § 1. History does, of course, have models in which current practical considerations proceed without inconvenient individual protections. "[T]he mere fact that law enforcement may be made more efficient can never by itself justify disregard" of constitutional search and seizure requirements. *Mincey v. Arizona*, 437 U.S. 385, 393, 98 S. Ct. 2408, 2414, 57 L. Ed. 2d 290, 301 (1978).

In any event, even on a pragmatic level, while it may be somewhat inconvenient, the notion that obtaining a warrant is burdensome is no

longer sustainable. At the time *Carroll v. United States* was decided, it might have taken several hours or even days to obtain a warrant. 267 U.S. 132, 45 S. Ct. 280, 69 L. Ed. 543 (1925) (establishing the automobile exception, creating a rule that presumes exigency based upon the mobility of an automobile suspected to contain evidence of criminal activity or contraband); *see* Carol A. Chase, *Privacy Takes a Back Seat: Putting the Automobile Exception Back on Track After Several Wrong Turns*, 41 B.C. L. Rev. 71, 87–89 (1999) [hereinafter Chase]. But, things have changed. As early as 1972, police in California obtained a warrant to search a home in twelve minutes. *People v. Aguirre*, 103 Cal. Rptr. 153, 155 (App. Dep't Super. Ct. 1972). In 1998, an Arizona state court noted that a police department was able to get a warrant in as little as fifteen minutes. *State v. Flannigan*, 978 P.2d 127, 131 (Ariz. Ct. App. 1998). Closer to home, a federal trial court in the southern district of Iowa noted that it takes as little as twenty minutes to obtain a telephonic search warrant. *United States v. Baker*, 520 F. Supp. 1080, 1084 (S.D. Iowa 1981). I agree with Chief Justice Cady's special concurrence that in this day and age, with all of our marvelous technology, there is no reason why police officers with probable cause cannot obtain a search warrant with expedition. If a warrant cannot be expeditiously obtained, the problem is not with the warrant requirements of article I, section 8, but is likely an administrative problem that needs to be resolved by local authorities.

The dissent stresses the need for a bright-line rule in this case. The need for "bright-lines" is a good slogan, but the question of a bright-line poses a number of difficult problems. At the outset, some problems, including those of constitutional dimension, may not be amenable to a bright-line approach. For instance, the question of probable cause must

be based on the totality of the circumstances and all legitimate inferences. A set of bright-line rules would be of no help and would do some harm. Similarly, in a civil context, the Restatement (Third) of Torts rejects bright-line rules in negligence cases with respect to duty and scope of duty because of the tremendous factual variation in negligence cases that defy rational categorization. *See Thompson v. Kaczinski*, 774 N.W.2d 829, 834–35 (Iowa 2009) (citing Restatement (Third) of Torts: Liab. for Physical Harm §§ 6, 7 (Proposed Final Draft No. 1, 2005)). A bright-line rule favoring bright-lines is a bad rule.

In addition, even if the subject matter appears amenable to a bright-line rule, the rule must be properly constructed and placed. A bright-line rule that tramples on constitutional rights may be crystal clear and plainly unlawful. In constitutional law, crafting an appropriate bright-line rule and putting it in the right place is a delicate matter. While a bright-line rule may be promoted on grounds of clarity, one must be alert to the possibility that the placement of the bright-line—where you draw the line, to use a colloquial phrase—may effectuate a significant and even dramatic shift in substantive law.

The Supreme Court's effort to establish bright-line rules in the area of search-incident-to-arrest cases illustrates the difficulty. The Supreme Court attempted to draw and place a bright-line in *Marron v. United States*, 275 U.S. 192, 199, 48 S. Ct. 74, 77, 72 L. Ed. 231, 238 (1927), then moved it four years later in *Go-Bart Importing Co. v. United States*, 282 U.S. 344, 358, 51 S. Ct. 153, 158, 75 L. Ed. 374, 383 (1931), then modified it again in *Harris v. United States*, 331 U.S. 145, 169, 67 S. Ct. 1098, 1110, 91 L. Ed. 1399, 1415–16 (1947), and revised it again in *United States v. Rabinowitz*, 339 U.S. 56, 62–63, 70 S. Ct. 430, 434, 94 L. Ed. 653, 658–59 (1950), which was then overruled in part by

*Chimel v. California*, 395 U.S. 752, 768, 89 S. Ct. 2034, 2042–43, 23 L. Ed. 2d 685, 696–97 (1969), which was itself modified in *New York v. Belton*, 453 U.S. 454, 459–60, 101 S. Ct. 2860, 2864, 69 L. Ed. 2d 768, 774–75 (1981), which was undercut in *Thornton v. United States*, 541 U.S. 615, 621–22, 124 S. Ct. 2127, 2131–32, 158 L. Ed. 2d 905, 913–14 (2004), and finally revised again in *Arizona v. Gant*, 556 U.S. 332, 343–44, 129 S. Ct. 1710, 1719, 173 L. Ed. 2d 485, 496–97 (2009). As one of the leading constitutional scholars has observed, "What renders substantive fourth amendment law incomprehensible, however, is not the lack of categorical rules but too many of them." Albert W. Alschuler, *Bright Line Fever and the Fourth Amendment*, 45 U. Pitt. L. Rev. 227, 287 (1984).

In any event, this case has a rule that strikes me as pretty bright: namely, that when a locked container in an automobile is plainly out of the reach of an arrested person, who is handcuffed and sitting in the back of a police car, and the person's confederates are similarly removed from the proximity of the locked container, the police may not conduct a search incident to arrest without a warrant.

Importantly, the rule in this case is drawn in the right place. The placement of the line in the court's opinion is required by the principle of the proportionality rule, which is a central component of search and seizure law under article I, section 8. The theory of the search-incident-to-arrest exception to the warrant requirement, which is not challenged in this case, generally allows police to search an arrested person and areas within the arrested person's reach in order to prevent the arrestee from seizing a weapon or destroying evidence. *See State v. McGrane*, 733 N.W.2d 671, 677 (Iowa 2007). The scope of the exception to the warrant requirement, therefore, must be limited to those situations in which an

arrestee might seize a weapon or destroy evidence. *See id.* However, when the suspect is handcuffed in the police car and his confederates are also removed from the area or thing to be searched, the search-incident-to-arrest exception simply does not apply. To allow such a search would violate the proportionality requirement of search and seizure law. On the merits, the court's opinion is spot on.

While the dissent claims to advocate bright-line rules, such advocacy is, to some extent, inconsistent with its strong preference for federal authority, which seems to be implicit in the neutral criteria argument it advances. For instance, in *Schneckloth v. Bustamonte*, the United States Supreme Court rejected a bright-line requirement of knowing consent in favor of a "blender" method of constitutional adjudication in which all the circumstances present are thrown into a blender like fruits and vegetables, the blender is turned on high, and judges rule based upon a judicial taste test. 412 U.S. 218, 225–26, 93 S. Ct. 2041, 2047, 36 L. Ed. 2d 854, 861–62 (1973). Some like it sweet, some like it sour, some like it bitter. With the application of *Schneckloth*, you are likely to learn more about the world view of the judge—specifically, the judge's philosophy of language and knowledge, and acceptance (or rejection) of principles of social psychology—than the true nature of the consent. Under the theory of the dissent, the neutral criteria would be employed as a barrier to prevent the court from adopting a different, more predictable, and at least arguably better, approach to the problem. As will be seen below, however, the central criteria to determine the proper approach under the Iowa Constitution should not be compliance with some kind of artificial checklist or neutral criteria designed to inhibit this court's range of constitutional options under the Iowa Constitution. Instead, the court should use ordinary

tools of constitutional interpretation, well known to lawyers and taught at every law school, to determine which approach to a particular constitutional issue is more persuasive and demonstrates overall fidelity to the underlying constitutional values.

Another issue in the case is officer safety. The United States Supreme Court has traditionally been extremely attentive to issues of officer safety. The high court has recognized the lack-of-safety concern in cases like this one. *See, e.g., Chimel*, 395 U.S. at 753–54, 763, 89 S. Ct. 2035, 2040, 23 L. Ed. 2d at 688, 694 (finding risk that handcuffed suspect in his residence might escape and seize a weapon in next room was insufficient to justify search). In *Thornton*, Justice Scalia declared that for an arrested person in a squad car to be a threat, he or she must have " 'the skill of Houdini and the strength of Hercules.' " 541 U.S. at 626, 124 S. Ct. at 2134, 158 L. Ed. 2d at 916 (Scalia, J., concurring in the judgment) (quoting *United States v. Frick*, 490 F.2d 666, 673 (5th Cir. 1973) (Goldberg, J., concurring in part and dissenting in part)). Further, Justice Scalia noted the government was unable to produce even a single example between 1990 and 2003 of a handcuffed arrestee retrieving weapons or evidence from his nearby vehicle. *Id.* In *Gant*, Justice Scalia referred to *Belton*'s reasoning as "fanciful reliance upon officer safety." 556 U.S. at 353, 129 S. Ct. at 1725, 173 L. Ed. 2d at 502 (Scalia, J., concurring). I think these observations are equally applicable in this case.

**II. Analysis of Neutral Criteria in State Constitutional Adjudication.**

**A. Current Status of Iowa Law.** In *State v. Ochoa*, we stated that in considering search and seizure issues under article I, section 8 of the Iowa Constitution, "The degree to which we follow United States Supreme

Court precedent, or any other precedent, depends solely upon its ability to persuade us with the reasoning of the decision." 792 N.W.2d 260, 267 (Iowa 2010). The principle that United States Supreme Court opinions provide guidance only based upon their persuasive power was endorsed in *State v. Baldon,* 829 N.W.2d 785, 790 (Iowa 2013). In that case, we cited *Ochoa* with approval in addition to citing an early search and seizure case rejecting the exclusionary rule adopted by the United States Supreme Court. *Id.* (citing *Ochoa,* 792 N.W.2d at 281–86, 287 n.91; *State v. Tonn,* 195 Iowa 94, 104–05, 191 N.W. 530, 535–36 (1923) *abrogated on other grounds by Mapp v. Ohio,* 367 U.S. 643, 654–55, 81 S. Ct. 1684, 1691, 6 L. Ed. 2d 1081, 1089–90 (1961)).[7]

In *State v. Short,* we again discussed at length the rationale for independent state constitutional adjudication under article I, section 8. 851 N.W.2d 474, 481–92 (Iowa 2014). We reaffirmed the approach of *Ochoa* and *Baldon,* and rejected the notion that a departure from federal precedent could occur only if certain criteria were met. *Id.* at 490–92.

In *Short,* we recognized that historically the development of independent state constitutional law has not been universally celebrated and has occasionally drawn "bitter, accusatorial dissent[s]." *Id.* at 486 (internal quotation marks omitted). Citing a New Hampshire case, we noted that " 'heightened rhetoric adds nothing to the jurisprudence of

---

[7]In *Tonn,* this court embraced a stricter approach to search and seizure under the Iowa Constitution than federal law at the time of the decision. 195 Iowa at 104–07, 191 N.W. at 535–36. This case makes the powerful point that independent state constitutional law is neither conservative nor liberal. It simply preserves what the United States Supreme Court has referred to as our "free and unfettered" authority in interpreting our state constitution. *Minnesota v. Nat'l Tea Co.,* 309 U.S. 551, 557, 60 S. Ct. 676, 679, 84 L. Ed. 920, 924 (1940). The *Tonn* court did not use criteria to depart from federal precedent, but found its approach more persuasive. 195 Iowa at 100–07, 191 N.W. at 533–36.

our State.'" *Id.* (quoting *State v. Canelo*, 653 A.2d 1097, 1106 (N.H. 1995) (Johnson, J., concurring specially)).  We further cited a former president of the American Bar Association, who noted that "'[i]ntemperate, inaccurate, and emotional criticism . . . undermines public confidence in the impartiality of the judiciary and hence its independence.'"  *Id.* at 506 (alteration in original) (quoting Alfred P. Carlton Jr., *Preserving Judicial Independence—An Exegesis*, 29 Fordham Urb. L.J. 835, 841 (2002)).  Notwithstanding the dissents, we cited G. Alan Tarr, a leading scholar in the field, who, after a comprehensive review of the authorities, declared, "the concern about the legitimacy of relying on state constitutional guarantees 'has largely been put to rest.'"  *Id.* at 486 (quoting G. Alan Tarr, *Understanding State Constitutions* 169 (1998) [hereinafter Tarr]).[8]

Our approach to independent state constitutional law is similar to that adopted in a number of jurisdictions.  *See, e.g., Gerawan Farming, Inc. v. Lyons*, 12 P.3d 720, 751–52 (Cal. 2000) (noting Supreme Court decisions are given voluntary respectful consideration); *State v. Campbell*, 759 P.2d 1040, 1044 n.7 (Or. 1988) (noting there is no presumption that interpretations of the United States Supreme Court are correct under the state constitution); *State v. Tiedmann*, 162 P.3d 1106, 1114 (Utah 2007) ("There is no presumption that federal construction of similar language is correct.").  As noted by Tarr, rulings by the Supreme Court "do not constitute authoritative pronouncements but are merely accounts of constitutional provisions entitled to respectful consideration by state

---

[8]The dissent quotes Tarr who summarizes arguments about legitimacy that have been raised in the past, but omits his conclusion that the concern "has largely been put to rest."  Tarr at 169.

judges independently seeking the meaning of their state constitutions." Tarr at 207.

As noted by Robert Williams, calls for neutral criteria rest on a faulty premise. Robert F. Williams, *The Law of American State Constitutions* 148 (2009) [hereinafter Williams]. The premise is that the constitutional decisions of the United States Supreme Court are somehow presumptively correct and should generally be adopted by state supreme courts. *See id.* This premise is nowhere supported in the history or text of the Iowa or Federal Constitutions or in the structure of the federal system. As noted by Justice Stevens, the presumption of correctness of United States Supreme Court decisions with respect to state constitutional issues arises from a "misplaced sense of duty." *Delaware v. Van Arsdall*, 475 U.S. 673, 699, 106 S. Ct. 1431, 1445, 89 L. Ed. 2d 674, 696 (1986) (Stevens, J., dissenting). In *Short*, we cited Williams in supporting the *Ochoa* holding that in the development of independent state constitutional law, the value of federal precedent depended solely upon its persuasive force. 851 N.W.2d at 481, 490; *see State v. Briggs*, 199 P.3d 935, 942 (Utah 2008) (noting a state court does not presume a federal interpretation is correct); *see also Campbell*, 759 P.2d at 1044 n.7 (same); *Tiedmann*, 162 P.3d at 1114 (same).

The dissent does not believe the approach in *Ochoa*, *Baldon*, and *Short* is entitled to stare decisis, nor does it think the approach in this case is entitled to stare decisis.[9] The operative rule, apparently, is that

---

[9]There is a substantial debate in the literature as to whether and the degree to which stare decisis applies to constitutional interpretation. *See* Jack L. Landau, *Some Thoughts About State Constitutional Interpretation*, 115 Penn St. L. Rev. 837, 867–68 (2011) [hereinafter Landau]. As noted by Landau, some scholars say the doctrine has no application to constitutional questions, others say it has less application, and still others say it is fully applicable. *Id.* & nn. 113–15. *Compare* Gary Lawson, *The Constitutional Case Against Precedent*, 17 Harv. J.L. & Pub. Pol'y 23, 24 (1994) (noting

cases the dissent agrees with are entitled to stare decisis, but cases that it disagrees with are not. Although the dissent seeks to appropriate the term stare decisis for its own use, the dissent in this case does not honor its principles. Even though the court has, once again in this case, rejected the neutral-criteria doctrine the State seeks to advance, the dissent does not take note of that. It chooses to give legal advice to the State, encouraging it to relitigate the losing issue again and again. A reading of the four dissents in *Pals, Baldon, Short,* and this case demonstrates the doctrine of stare decisis is not at work.[10] Instead, we see its antithesis, the doctrine of perpetual dissent.

---

that "the practice of following precedent is not merely nonobligatory, or a bad idea," it is unconstitutional), *with* Richard H. Fallon, Jr., *Stare Decisis and the Constitution: An Essay on Constitutional Methodology*, 76 N.Y.U. L. Rev. 570, 572 (2001) [hereinafter Fallon] (emphasizing stare decisis "is a doctrine of constitutional magnitude"). Landau asserts "in the case of state constitutional interpretation, the pull of stare decisis may not be as strong as it is in other contexts." Landau, 115 Penn St. L. Rev. at 838. In addition, the doctrine of stare decisis is fairly complex, with a variety of theories including a "mistake approach," a "prudential approach," and a "special justification approach." Steven J. Burton, *The Conflict Between Stare Decisis and Overruling in Constitutional Adjudication*, 35 Cardozo L. Rev. 1687, 1690 (2014) (internal quotation marks omitted). Or, as noted by Professor Fallon, "stare decisis presents constitutional puzzles." Fallon, 76 N.Y.U. L. Rev. at 596.

[10]To the extent the dissent claims to prefer a strong stare decisis doctrine, such an approach would be inconsistent with the weak stare decisis employed by the United States Supreme Court in *Citizens United v. Federal Election Commission. Compare* 558 U.S. 310, 362–65, 130 S. Ct. 876, 912–13, 175 L. Ed. 2d 753, 797–99 (2010) (overruling twenty-year-old precedent finding it was "not well reasoned"), *with id.* at 408–14, 130 S. Ct. at 938–42, 175 L. Ed. 2d at 826–29 (Stevens, J., concurring in part and dissenting in part) (noting majority's weak reliance on claims of stare decisis). The United States Supreme Court similarly employed weak stare decisis adherence in *National Federation of Independent Business v. Sebelius. Compare* 567 U.S. ___, ___, 132 S. Ct. 2566, 2586–91, 183 L. Ed. 2d 450, 474–80 (2012) (holding the Commerce Clause does not support the individual mandate, as the Court's precedents describe the power as reaching only "activity," and the individual mandate "does not regulate existing commercial activity"), *with id.* at ___, 132 S. Ct. at 2609, 183 L. Ed. 2d at 499–500 (Ginsburg, J., concurring in part, concurring in the judgment in part, and dissenting in part) (noting the majority's "crabbed reading of the Commerce Clause . . . should not have staying power"). If one were consistent, the dissent would need to apply its own criteria approach to justify its departure from these precedents.

**B. Criteria in State Constitutional Interpretations.** A number of state supreme courts have announced they may use certain criteria in evaluating claims under state constitutional law. The three leading cases describing criteria are *State v. Hunt*, 450 A.2d 952 (N.J. 1982), *Commonwealth v. Edmunds*, 586 A.2d 887 (Pa. 1991), and *State v. Gunwall*, 720 P.2d 808 (Wash. 1986) (en banc). A number of other states, often citing these cases, have indicated the usefulness of criteria in state constitutional adjudication. A number of these cases are collected in the dissent.

The criteria in these states vary somewhat but have some things in common. In particular, the criteria usually include constitutional text, constitutional history, and precedents in other state courts, as among the factors that may be considered in independent state constitutional analysis. *See, e.g., Hunt*, 450 A.2d at 955; *id.* at 965–67 (Handler, J., concurring); *Edmunds*, 586 A.2d at 895; *Gunwall*, 720 P.2d at 811.

State supreme courts that have ventured into announcing criteria have often subsequently faced battles over what the criteria mean. *See* Williams at 150–62 (citing examples of state experiences with criteria approaches). A critical question is whether the criteria are hard substantive criteria or soft advocacy criteria. Hard substantive criteria are criteria designed to erect a barrier to independent state constitutional adjudication and give rise to a presumption that the federal approach should be adopted absent a demonstration by the proponent of a divergent state constitutional rule that most or all of the criteria have been met. In other words, state constitutional law independent of federal precedent is governed by an "ironclad checklist," and when the United States Supreme Court changes course, the state court must follow unless the requirements of a thread-the-needle checklist have been met.

*See People v. Scott*, 593 N.E.2d 1328, 1347 (N.Y. 1992) (Kaye, J., concurring).

Soft advocacy criteria, however, are merely designed to improve the quality of advocacy by encouraging the parties to consider constitutional questions from a number of different points of view. Many state courts and state supreme court justices have bemoaned the lack of thorough briefing of state constitutional issues and have sought to use criteria to enhance the quality of advocacy. *See, e.g., State v. Morales*, 657 A.2d 585, 589 & n.10 (Conn. 1995) (requiring counsel to use stated nonexclusive criteria when raising state constitutional claims).

The battle over whether criteria should be considered hard substantive criteria or soft advocacy criteria may be seen in two of the leading criteria states, New Jersey and Washington. In New Jersey, for instance, the meaning of the *Hunt* factors was a matter of contest from the very beginning. Justice Handler and Justice Pashman battled from the get-go over whether the criteria created a presumption of the correctness of federal law. *Hunt*, 450 A.2d at 960 & n.1 (Pashman, J., concurring). In Washington, the battle over the meaning of the *Gunwall* criteria extended over a period of many years. *See* Hugh D. Spitzer, *New Life for the "Criteria Tests" in State Constitutional Jurisprudence: "Gunwall is Dead—Long Live* Gunwall,*"* 37 Rutgers L.J. 1169, 1199 (2006) [hereinafter Spitzer] (suggesting the *Gunwall* criteria as a barrier are "dead" and the *Gunwall* criteria as nonexclusive suggestions for advocacy "live"). If we were to adopt criteria for state constitutional interpretation, does anyone doubt there would be a battle royale over their meaning and application?

In the end, however, many of the states have clearly embraced a soft advocacy approach to their criteria. An indication of the dominance

towards this approach is the increasing reference to the criteria as "nonexclusive." *See, e.g., Gunwall*, 720 P.2d at 811 (noting the factors are "nonexclusive"). Listing criteria as nonexclusive does seem to indicate they are suggestions rather than mandatory requirements.

Further, the Pennsylvania Supreme Court has declared the *Edmunds* factors are not a mandate that a decision recognizing heightened protections utilize the criteria but instead are intended as a guide for litigants. *Commonwealth v. Shaw*, 770 A.2d 295, 298 n.2 (Pa. 2001). In the state of Washington, after several decades of litigation, a commentator has concluded that the *Gunwall* factors have been made so flexible and so encompassing that they have simply merged with the ordinary principles of constitutional litigation. *See* Spitzer, 37 Rutgers L.J. at 1184–87.

Hard or soft, other states have used criteria so open-endedly they approach normal rules of constitutional adjudication. For example, in *State v. McMurray*, a case cited by the dissent, the Minnesota Supreme Court noted that under circumstances when the state and federal constitutions use substantially the same language, additional state protection may be afforded,

> (1) when the United States Supreme Court has made a sharp or radical departure from its previous decisions and we discern no persuasive reason to follow such a departure; (2) when the Court has retrenched on a Bill of Rights issue; or (3) when the Court precedent does not adequately protect our citizens' basic rights and liberties.

860 N.W.2d 686, 690 (Minn. 2015) (internal quotation marks omitted). These open-ended criteria give the Minnesota Supreme Court ample room to develop independent state constitutional law according to ordinary principles of constitutional interpretation.

A number of cases under article I, section 10 of the Minnesota Constitution, which is a search and seizure provision parallel to article I, section 8 of the Iowa Constitution, demonstrate the flexibility. For example, in *State v. Carter*, the Minnesota Supreme Court held that a sniff by a drug detection dog outside a storage unit was a "search," contrary to prevailing federal precedent. 697 N.W.2d 199, 208, 210–11 (Minn. 2005) (en banc). In *State v. Askerooth*, the court declared that the approach of the United States Supreme Court in *Atwater v. City of Lago Vista*, 532 U.S. 318, 354, 121 S. Ct. 1536, 1557, 149 L. Ed. 2d 549, 577 (2001), which allowed full arrests for minor criminal violations, would not be followed under the Minnesota Constitution. 681 N.W.2d 353, 363 (Minn. 2004) (en banc). In *State v. Fort*, the Minnesota court held that a consent search of a passenger in a vehicle stopped for routine traffic violations exceeded the scope of the search and was invalid under the Minnesota Constitution regardless of what federal law might allow. 660 N.W.2d 415, 418–19 (Minn. 2003) (en banc). In *Ascher v. Commissioner of Public Safety*, the court refused to follow *Michigan Department of State Police v. Sitz*, 496 U.S. 444, 455, 110 S. Ct. 2481, 2488, 110 L. Ed. 2d 412, 423 (1990), holding that random police roadblocks for intoxicated drivers without reasonable suspicion violated article I, section 10 of the Minnesota Constitution. 519 N.W.2d 183, 187 (Minn. 1994) (en banc). In *In re Welfare of E.D.J.*, the Minnesota Supreme Court rejected *California v. Hodari D.*, 499 U.S. 621, 626, 111 S. Ct. 1547, 1550, 113 L. Ed. 2d 690, 697 (1991), holding that a person facing contact with a police officer is "seized" when he reasonably concludes that he is not free to leave, noting that it was not "persuaded" by the United States Supreme Court's departure from its earlier cases. 502 N.W.2d 779, 781–83 (Minn. 1993) (en banc). Nothing in the case of *Kahn v. Griffin*, which

suggests factors that parties may choose to brief with respect to constitutional issues based on prior caselaw, indicates these cases were wrongly decided. 701 N.W.2d 815, 829 (Minn. 2005) (en banc) (suggesting, as a "general" rule, seven nonexclusive factors).

Indeed, the notion that criteria are usually only suggestions for advocacy and not designed as barriers to independent state constitutional law can be demonstrated in the context of automobile searches and seizures. The dissent declares that if we adopted a neutral-criteria approach, the result would be different in this case. However, that assumes we adopt a hard substantive approach or ironclad-checklist approach. An examination of the vibrant independent state law in leading criteria jurisdictions shows the criteria have not been employed as a major barrier to the development of independent state constitutional law. For example, the Pennsylvania Supreme Court has declined to follow the *Carroll* doctrine. *Commonwealth v. Brown*, 23 A.3d 544, 553 (Pa. Super. Ct. 2011). The Washington Supreme Court has also declined to follow *Carroll*. *State v. Snapp*, 275 P.3d 289, 296 (Wash. 2012) (en banc). The New Jersey Supreme Court rejected *Belton* in the court's opinion in *State v. Eckel*, 888 A.2d 1266, 1277 (N.J. 2006). *See* Paul Stern, *Revamping Search-and-Seizure Jurisprudence Along the Garden State Parkway*, 41 Rutgers L.J. 657, 688–92 (2010). Similarly, Wyoming, another criteria state, declined to follow *Belton*. *Vasquez v. State*, 990 P.2d 476, 489 (Wyo. 1999).[11]

---

[11]The dissent cites a footnote in a recent Utah case supporting its argument that we should adhere to federal precedent in interpreting parallel provisions of the Iowa Constitution. *See State v. Houston*, ___ P.3d ___, ___ n.133, 2015 WL 773718, at *14 n.133 (Utah Mar. 13, 2015). However, the citation is incomplete and gives the wrong impression. The position of the Utah court is more balanced, noting, "While we are certainly not required to adopt a federal interpretation for our state provision, we likewise are not forbidden from doing so." *Id.* I agree with that statement. *Cf. State v.*

The above experience demonstrates two things. First, in most states, criteria have not served as a barrier to independent state constitutional adjudication as advocated by the dissent. Second, a significant downside to criteria is that they generate satellite litigation over their substance and proper application. *See* Williams at 151–52 (noting in criteria states, the criteria themselves become the focus of

---

*Breuer*, 808 N.W.2d 195, 197–99, 199, 201 (Iowa 2012) (declining to adopt Massachusetts approach to requirement that warrant be physically present at time of search and following approach of federal precedent). Additionally, the Utah court rejected conclusory opinions that simply adopt a different state constitutional standard without explanation or rationale. *See Houston*, ___ P.3d at ___ n.133, 2015 WL 773718, at *14 n.133. I agree with that, too. Indeed, our cases have laid out, sometimes in thorough (or excessive?) detail, why we have departed from federal precedent. *See Short*, 851 N.W.2d at 481–92; *Baldon*, 829 N.W.2d at 791–803; *Pals*, 805 N.W.2d at 777–84; *Ochoa*, 792 N.W.2d at 268–91. I also agree with the declaration by the Utah Supreme Court in *State v. Tiedemann*, rejecting "a formula of some kind" for adjudication of state constitutional issues. 162 P.3d 1106, 1114 (Utah 2007). As the Utah court stated:

> In theory, a claimant could rely on nothing more than plain language to make an argument for a construction of a Utah provision that would be different from the interpretation the federal courts have given similar language. Independent analysis must begin with the constitutional text and rely on whatever assistance legitimate sources may provide in the interpretive process. There is no presumption that federal construction of similar language is correct.

*Id.* at 1115. Additionally, the dissent cites *State v. Anderson*, for the notion that Utah's preference is to interpret the search and seizure provision of the Utah Constitution in "accord with the Fourth Amendment." 910 P.2d 1229, 1238 (Utah 1996). The *Anderson* case in turn cites *State v. Watts* for this proposition; however, the *Watts* case notes the more nuanced approach of the Utah Supreme Court:

> In declining to depart in this case from our consistent refusal heretofore to interpret article I, section 14 of our constitution in a manner different from the fourth amendment to the federal constitution, we have by no means ruled out the possibility of doing so in some future case. Indeed, choosing to give the Utah Constitution a somewhat different construction may prove to be an appropriate method for insulating this state's citizens from the vagaries of inconsistent interpretations given to the fourth amendment by the federal courts.

750 P.2d 1219, 1221 n.8 (Utah 1988); *see Baldon*, 829 N.W.2d at 830–31 (Appel, J., specially concurring) (citing inconsistencies "on the proper application of Fourth Amendment law among the Justices").

litigation rather than the underlying state constitutional question).  In reality, there is no mechanical checklist that can be applied to determine each and every question of state constitutional law.  The court is thus correct in reaffirming the *Tonn–Ochoa* approach, reiterated in *Short* and *Baldon*, and in rejecting appeals to establish artificial criteria for independent state constitutional adjudication.  *Short*, 851 N.W.2d at 487; *Baldon*, 829 N.W.2d at 790–91.

**C. The State's Neutral Criteria.**  While we have rejected the criteria approach for state constitutional adjudication, the State's neutral criteria suggest several potential approaches to independent state constitutional law.  Subject to ethical constraints and procedural rules, we do not limit the substantive advocacy of parties who appear before us.  Any party may make what it considers its most persuasive state constitutional arguments.  As will be seen below, we have already explored all of the State's neutral criteria in our cases, and the State's effort in this case is essentially a repackaging and relabeling of concepts rejected in our caselaw.  While we have resisted any formula for constitutional adjudication, our caselaw amply illuminates the manner in which various authorities may contribute to the development of independent state constitutional law.

1. *Development of the claim in lower courts*.  The first criterion proposed by the State is development of the claim in lower courts.  This factor has not generally been cited by other criteria states: it is missing in *Hunt, Edmunds, Gunwall*, and other criteria cases.  *See generally*, Williams at 146–62.  The thrust of the State's position here, however, can best be understood as one of issue preservation.  The State in effect presses the view that if a party has not presented an argument based on

its neutral criteria, any claim based upon an independent state constitutional theory is waived.

Even in criteria states, such an approach may not be followed. For example, in Pennsylvania, the court has emphasized that while briefing on its factors is certainly helpful, the failure to do so is not fatal to a state constitutional claim. *See Commonwealth v. Swinehart*, 664 A.2d 957, 961 n.6 (Pa. 1995); Phyllis W. Beck, *Foreword: Stepping Over the Procedural Threshold in the Presentation of State Constitutional Claims*, 68 Temp. L. Rev. 1035, 1038–39 (1995) (emphasizing that a litigant seeking to assert rights under state constitutions should be "free from a technical procedure that may not always serve to advance the inquiry at hand").

In any event, we have established our approach to issue preservation regarding independent state constitutional law in a number of cases. When a constitutional claim is made but neither the State nor Federal Constitution is specifically identified, we consider the claim preserved under both the State and Federal Constitutions. *See, e.g.*, *State v. Harrington*, 805 N.W.2d 391, 393 n.3 (Iowa 2011); *King v. State*, 797 N.W.2d 565, 571 (Iowa 2011). On the other hand, when a claim is expressly made citing the Fourth Amendment but no mention is made of the state constitution, we consider the claim waived. *See, e.g., State v. Vance*, 790 N.W.2d 775, 780 (Iowa 2010); *State v. Allensworth*, 748 N.W.2d 789, 791 n.2 (Iowa 2008). When both the State and Federal Constitutions are cited but a party relies solely on the applicable federal constitutional standard, we apply the federal constitutional standard but reserve the right to apply it in a more stringent manner. *See, e.g., State v. Breuer*, 808 N.W.2d 195, 200 (Iowa 2012); *State v. Pals*, 805 N.W.2d 767, 771–72 (Iowa 2011); *King*, 797 N.W.2d at 571; *State v. Bruegger*,

773 N.W.2d 862, 883 (Iowa 2009). We have thus already addressed the issues raised in the State's first criteria.

2. *Constitutional text.* The second criterion offered by the State is constitutional text. This is a common factor cited by many criteria states. *See, e.g., Hunt,* 450 A.2d at 965 (Handler, J., concurring); *Edmunds,* 586 A.2d at 895; *Gunwall,* 720 P.2d at 811. As one state supreme court has stated, an independent state constitutional argument may be made on the basis of text alone. *See Tiedemann,* 162 P.3d at 1115. We have considered the role played by text in a number of our prior cases. *See, e.g., Short,* 851 N.W.2d at 500–01; *Baldon,* 829 N.W.2d at 823–24 (Appel, J., specially concurring); *Ochoa,* 792 N.W.2d at 268–69. I stand by the discussion in those cases.

The text of a constitutional provision is the starting point of analysis even in ambiguous and open-ended constitutional provisions like article I, section 8 of the Iowa Constitution. In the context of search and seizure law, however, textual analysis is often very challenging, so challenging that some preeminent authorities have concluded that the text itself offers no meaningful guidance on a number of key interpretive issues. *See* Anthony G. Amsterdam, *Perspectives on the Fourth Amendment,* 58 Minn. L. Rev. 349, 353–54 (1974). Particularly challenging has been the relationship between the reasonableness clause and the warrant clause, an issue addressed at length in *Short,* 851 N.W.2d at 483–85.

To the extent the state constitution has text not included in the Federal Constitution, like the language in article I, section 1 based on the Virginia Declaration of Rights, federal authority, of course, has little value. *See City of Sioux City v. Jacobsma,* 862 N.W.2d 335, 348–49 (Iowa 2015); Bruce Kempkes, *The Natural Rights Clause of the Iowa*

*Constitution: When the Law Sits Too Tight*, 42 Drake L. Rev. 593, 634–35 (1993). Further, to the extent there are differences in language in texts related to the same subject matter, any difference in language between the Iowa Constitution and its federal counterpart is worth a hard look. For example, the right to counsel provision in article I, section 10 of the Iowa Constitution extending the right to "all criminal prosecutions, and in all cases involving the life, or liberty of an individual" differs from its federal counterpart. Iowa Const. art. I, § 10; *see State v. Young*, 863 N.W.2d 249, 256–57 (Iowa 2015). Such differences in text should be carefully studied and may help support a different interpretation under the state constitution than under prevailing federal authority. *See, e.g., Young*, 863 N.W.2d at 258, 281.

It is also true, as an abstract matter, that a case from another jurisdiction relying on a differently phrased state constitutional provision *may* be less authoritative than one decided under a similar state constitutional provision. This is not, however, to use the vernacular of the dissent, a bright-line rule. The underlying state court decision may not turn on distinctive language but may be based upon an analysis that applies with equal force to an Iowa constitutional provision covering the same subject matter. Different language in state constitutions may still have much in common, like the proverbial overlapping Venn diagram. Nonetheless, it is undeniable that a state court decision decided under a differently worded constitutional provision *may* be less persuasive or not persuasive at all, if the decision is based largely or exclusively on language absent from the counterpart in the Iowa Constitution.

One suspects, however, that in the hands of the dissenters, this factor is designed to be an ironclad, hard substantive criterion such that if the text of an Iowa constitutional provision is similarly worded to the

federal counterpart, the federal interpretation is presumptively (or maybe even definitely) correct. If so, this is, of course, the polar opposite of a neutral criterion. It would ironically impede the development of state constitutional law where there are parallel federal and state provisions, even though all the federal rights language was derived from previous state constitutional models. *See Baldon*, 829 N.W.2d at 804–05 (noting the United States Constitution "was the outgrowth of colonial experience and state constitutional precedents"); *see also* Willi Paul Adams, *The First American Constitutions: Republican Ideology and the Making of the State Constitutions in the Revolutionary Era* 55–56 (Rita & Robert Kimber trans., expanded ed. 2001) (noting John Adams's reasoning in recommending that New Hampshire form its own government); Robert F. Williams, *The State Constitutions of the Founding Decade: Pennsylvania's Radical 1776 Constitution and Its Influences on American Constitutionalism*, 62 Temp. L. Rev. 541, 579–80 (1989) (citing the emerging consensus that the Federal Bill of Rights originated in state and colonial rights guarantees). An approach that strongly presumes the correctness of federal authority under similarly phrased constitutional provisions is not a neutral criterion that requires careful textual analysis, but an unbalanced criterion that seeks to prevent the development of state constitutional law. We have repeatedly and unequivocally rejected this contention, and by now it should have been put to rest. *See, e.g., Short*, 851 N.W.2d at 486–87; *Baldon,* 829 N.W.2d at 790–91 (majority opinion) (recognizing *Tonn–Ochoa* analysis in interpreting nearly identical search and seizure language of the Iowa Constitution differently than its federal counterpart); *id.* at 824 (Appel, J., specially concurring) (citing various state supreme court cases supporting independent interpretation of provisions of state constitutions with parallel federal counterparts);

*Ochoa*, 792 N.W.2d at 267 (holding the degree to which we follow United States Supreme Court precedent, or any other precedent, "depends solely upon its ability to persuade us with the reasoning of the decision"). Indeed, the notion that state search and seizure provisions nearly identical to the federal language should be interpreted identically to their federal counterpart in connection with automobile stops has been rejected in leading criteria jurisdictions. *See Vance*, 790 N.W.2d at 788 (citing examples); *see, e.g., Eckel*, 888 A.2d at 1277; *Commonwealth v. White*, 669 A.2d 896, 901–02 (Pa. 1995); *Vasquez*, 990 P.2d at 488–89.

To the extent the State argues that text should be considered in state constitutional adjudication, there can be no quarrel. Text is always a starting point in constitutional adjudication. It would be wrong, however, to suggest that the text of article I, section 8 provides a definitive answer to many complex search and seizure questions. Consistent with the above cited authorities, however, there is no implication that the mere fact article I, section 8 of the Iowa Constitution has language similar to the Fourth Amendment gives rise to a presumption that the federal interpretation should be adopted. The power of federal precedent turns "solely" on its persuasive power. *See Ochoa*, 792 N.W.2d at 267.

3. *Constitutional history, including reports of state constitutional debates and state precedent.* The third criterion listed by the State is constitutional history, including reports of state constitutional debates and state precedent. Similar factors are cited in a number of criteria states. *See, e.g., Hunt*, 450 A.2d at 965; *Edmunds*, 586 A.2d at 895; *Gunwall*, 720 P.2d at 811. We have canvassed state and federal constitutional history in a number of our recent search and seizure

cases. *See, e.g., Short,* 851 N.W.2d at 481–506; *Ochoa,* 792 N.W.2d at 269–75.

We reviewed the historical background of the Fourth Amendment extensively in *Ochoa,* 792 N.W.2d at 269–73. The meaning of its history is, of course, subject to debate, and the historical record often does not provide much guidance on highly-focused, concrete interpretive questions in the area of search and seizure. In *Ochoa,* however, we concluded the Fourth Amendment history generally supported the view that the search provisions were a limitation on government power, that general warrants and writs of assistance were anathema to the founders, and that requiring particular facts to support a search is a limitation consistent with that history. *Id.*

While we should be cautious of drawing overbroad conclusions from historical study, I agree with the State that historical study of the origins of the Fourth Amendment may be relevant to state constitutional analysis. In *Short,* for instance, we cited the work of Thomas Y. Davies, who has encouraged state supreme courts to engage in authentic search and seizure historical analysis to avoid unoriginal use of reasonableness that engages in relativistic balancing. 851 N.W.2d at 501 (citing Thomas Y. Davies, *Correcting Search-And-Seizure History: Now-Forgotten Common-Law Warrantless Arrest Standards and the Original Understanding of "Due Process of Law,"* 77 Miss. L.J. 1, 118, 223–24 (2007)). We have attempted to follow Davies's suggestion. *See Ochoa,* 792 N.W.2d at 274–75. Additionally, William Cuddihy, in his magisterial volume on the history of the Fourth Amendment, concluded that the "warrant preference" approach to the text—the approach we embraced in *Short*—was the most consistent with the founders' intentions. William J. Cuddihy, *The Fourth Amendment: Origins and Original Meaning, 602–*

*1791* 602, 633–37, 734–42 (2009); *see also Short*, 851 N.W.2d at 497, 501; Tracey Maclin, *The Complexity of the Fourth Amendment: A Historical Review*, 77 B.U. L. Rev. 925, 928 (1997) ("[T]he 'warrant preference rule' . . . requires that the safeguards of the Warrant Clause define the reasonableness of a given search or seizure.").

With respect to article I, section 8 of the Iowa Constitution, we surveyed the history in *Ochoa* and did not discover materials having a direct bearing on search and seizure law. 792 N.W.2d at 274–75. This is not unusual. As noted by one scholar, state historical sources are "thin at best and wholly indeterminate at worst." Douglas S. Reed, *Popular Constitutionalism: Toward a Theory of State Constitutional Meanings*, 30 Rutgers L.J. 871, 873 (1999); *see also* Paul W. Kahn, *Interpretation and Authority in State Constitutionalism*, 106 Harv. L. Rev. 1147, 1153 (1993) (noting that state sources are "meager").

While the dissent in announcing its so-called neutral criteria embraces historical exploration, it avoids engaging in any historical consideration regarding what the Iowa founders would have thought of the proposed so-called neutral criteria. There is, of course, nothing in the debates about so-called neutral criteria. We do, however, know something about the founders' view of federal law and the United States Supreme Court's interpretation of it.

For example, George Ells, one of the leading Iowa founders, believed the Fugitive Slave Act of 1850 was an unconstitutional violation of due process. He stated that the Due Process Clause was "violated again and again by the dominant party in the land, which rides rough-shod ove[r] the necks of freemen." 1 *The Debates of the Constitutional Convention of the State of Iowa* 102 (W. Blair Lord rep., 1857) [hereinafter *The Debates*]. Further, he declared that "[i]f the words 'due process of

law,' shall in time be recognized by our judicial tribunals to mean what they really do mean, . . . then, [t]hat infamous Fugitive Slave Law will become a nul[l]ity." *Id.*[12]

William Penn Clarke, another of the leading players in the constitutional convention, was a supporter of John Brown, and actively helped Brown smuggle fugitive slaves out of Iowa to their eventual freedom in direct defiance of federal law. *See* Lowell J. Soike, *Necessary Courage: Iowa's Underground Railroad in the Struggle Against Slavery* 153–57 (2013) [hereinafter Soike]. Ells and Clarke do not seem to be the kind of persons who would write into the Iowa Constitution some principle of deference to federal judicial authority. And, of course, they did not.

However, the Iowa Constitution of 1857 contains provisions that were contrary to the Fugitive Slave Act of 1850, including the right to jury trials in cases involving liberty. *See Short*, 851 N.W.2d at 521 (citing *The Debates* 101–02); Ben. F. Shambaugh, *The Constitutions of Iowa* 270–71 (1934) (noting some opposition to the jury trial provision on the ground that it would "nullify[] the Fugitive Slave Law"). The jury trial provision appears contrary to the United States Supreme Court decision in *Prigg v. Commonwealth*, where the Court held a state could not impose protective procedures on the enforcement of the Fugitive Slave Act of 1793. 41 U.S. (16 Pet.) 539, 625–26, 10 L. Ed. 1060 (1842). James F. Wilson, a delegate to the Iowa constitutional convention who later gained fame as chairman of the United States House Committee on the

---

[12]Ells was taking the position announced by the Wisconsin Supreme Court in *In Re Booth*, which found that the Fugitive Slave Act violated due process under the United States Constitution. 3 Wis. 1, 41–43, 70 (1854). This outlier was overturned by the United States Supreme Court in *Ableman v. Booth*, 62 U.S. (21 How.) 506, 514, 526, 16 L. Ed. 169 (1858).

Judiciary, declared that "he did not care if the provision under consideration should conflict with federal law" because the Fugitive Slave Act was unconstitutional. Robert Cook, *Baptism of Fire: The Republican Party in Iowa, 1838–1878* 81 (1994) [hereinafter Cook].

Further, throughout the 1850s, there was a battle in Iowa over enforcement of laws related to slaves or former slaves where state courts were the forum of choice because of the inhospitable climate in federal court on these issues. In the case of *In re Jim* (1848), a state court judge discharged a claimed slave and fined the detective who had detained him. *See* Robert R. Dykstra, *Bright Radical Star: Black Freedom and White Supremacy on the Hawkeye Frontier* 17–18 (1993). The detective did not give up, but convinced a federal judge in Dubuque to order a precept for arrest for Jim, the claimed fugitive slave. *See id.* at 18. Supporters of Jim, however, countered by obtaining a writ of habeas corpus in Muscatine from the acting Chief Justice of the Iowa Supreme Court who, after a hearing, held that the arrest was improper, released the defendant, and declared to bystanders, "here is a free man." *Id.* (internal quotation marks omitted).

In another case involving a claimed fugitive slave in 1855, Governor James W. Grimes declared "if not in office, I am inclined to think that I should be a law-breaker." Cook at 65 (internal quotation marks omitted). He sent his associates to pack the trial which was before a commissioner for the federal district court in Burlington. *Id.*; *see also Outside In African-American History in Iowa 1838–2000* 68 (Bill Silog ed. 2001) [hereinafter *Outside In*]. Grimes sent for a state court judge to prepare a writ of habeas corpus in the event of an adverse result in the federal forum. *Outside In* at 68. When the alleged fugitive slave was freed for lack of evidence, Governor Grimes declared that "a slave

could not be returned from Des Moines County into slavery." Cook at 65–66 (internal quotation marks omitted). The alleged fugitive was soon on his way to Canada. *Outside In* at 68.

The case of *In re Ralph*, of course, employed an approach to African Americans that was nowhere found in the federal caselaw. 1 Morris 1 (Iowa 1839). Not surprisingly, the reaction of the founding generation to *Dred Scott* was one of bitter denunciation, including a joint resolution of the general assembly that " '*Dred Scott* [] is not binding in law.' " *See Short*, 851 N.W.2d at 484 (quoting 1858 Iowa Acts Res. 12, at 433). At the time of the 1857 Iowa Constitution, the United States Supreme Court was in the hands of judges sympathetic with the southern cause: the opposite was true in Iowa. Indeed, one of the causes of the civil war was the refusal of states like Iowa to conform with federal law with respect to slavery. *See* Confederate States of America – Declaration of the Immediate Causes Which Induce and Justify the Secession of South Carolina from the Federal Union (adopted Dec. 24, 1860), *available at* http://avalon.law.yale.edu/19th_century/csa_scarsec.asp [hereinafter Declaration of the Immediate Causes] (specifically citing the failure of northern states, including Iowa, to enforce federal law).[13] To my eye, these events, contemporaneous with the Iowa Constitution of 1857, provide barren soil for those that seek to impose federal lockstep directly or indirectly on Iowa courts in the name of history. *See generally* Mark S. Cady, *The Vanguard of Equality: The Iowa Supreme Court's Journey to*

---

[13]The South Carolina Declaration also references the refusal of Iowa to forward murderers for prosecution, an apparent reference to the efforts of Governor Samuel Kirkwood to avoid the arrest and extradition of Barclay Coppoc, one of the participants in John Brown's raid. *See* Declaration of the Immediate Causes. Governor Kirkwood stalled representatives of Virginia with technicalities long enough to allow Coppoc to escape. *See* Soike at 165–171.

*Stay Ahead of the Curve on an Arc Bending Towards Justice*, 76 Alb. L. Rev. 1991 (2013); Mark S. Cady, *A Pioneer's Constitution: How Iowa's Constitutional History Uniquely Shapes Our Pioneering Tradition in Recognizing Civil Rights and Civil Liberties*, 60 Drake L. Rev. 1133 (2012).

The important point, however, with respect to search and seizure law specifically, is that the lack of direct historical materials related to article I, section 8 should not be charged as a factor *against* an independent interpretation of state law. The lack of historical materials neither supports nor opposes a state constitutional interpretation different from prevailing federal law.[14] This is particularly true in the area of search and seizure, where current cases often involve modern developments such as cell phones, GPS devices, computerized records, and even automobiles, which the Iowa founders could not possibly have anticipated. Under the circumstances, to attribute lack of a historical record as a strike against thoughtful independent state constitutional adjudication is hardly a neutral criterion but is simply an artificial barrier designed to yield desired results and prevent consideration of the underlying merits of a state constitutional claim.

4. *Decisions of sister states, particularly when interpreting similar constitutional text.* The fourth criterion proposed by the State is the decisions of other states, particularly when interpreting similar constitutional provisions. In general, review of authority in other states

---

[14]The Iowa state historical materials may be thin in the sense that they do not directly address search and seizure issues but they are rich in another, more general sense. We know the 1857 framers, by putting the individual liberties in the first article of the Iowa Constitution, regarded them as having great importance. In addition, George Ells, Chair of the Committee on the Preamble and the Bill of Rights, declared " 'the Bill of Rights is of more importance than all the other clauses in the Constitution put together.' " *Short*, 851 N.W.2d at 482–83 (quoting *The Debates* 103).

is a criteria almost universally found in criteria jurisdictions. *See, e.g., Hunt,* 450 A.2d at 956–57; *Edmunds,* 586 A.2d at 895; *Gunwall,* 720 P.2d at 815–16. In our independent state constitutional cases, we have often looked at authority from other states for their persuasive power. *See, e.g., Short,* 851 N.W.2d at 481; *Baldon,* 829 N.W.2d at 818; *Ochoa,* 792 N.W.2d at 267.

Of course, there is no requirement authority exist in other states for a particular constitutional approach. Otherwise, the law would be the proverbial "fly frozen in amber." By definition, there always has to be a first jurisdiction that moves when the law changes. No one explicitly suggests, even the dissent, that the law should never change. Further, some questions of state constitutional law may be of first impression, even among the various state jurisdictions. Certainly, as a general matter, the caselaw of other states may be the source of persuasive authorities to aid in the interpretation of Iowa constitutional law.

In order to be persuasive authority, however, a "me too" case in a lockstep jurisdiction that simply incorporates federal law without an evaluation of its persuasive reasoning is of little value. Such precedent is not part of the body of considered reasoning of constitutional principles. Instead, we look to the persuasive power of the reasoning of other state supreme courts which, using their independent judgment, have sought to develop what they consider the best and soundest approach to state constitutional law. In looking at the competing approaches in state precedents, we do not make our determination by a majoritarian numbers game that assumes resolution of sensitive issues of state constitutional law may be determined on some kind of state constitutional abacus. What is critical with state constitutional precedents in other states, as with all cited authority, is the underlying

persuasive power of the reasoning. *See Ochoa*, 792 N.W.2d at 267 (emphasizing we are influenced by cases from other jurisdictions solely on the basis of their persuasive power).

Thus, the independent work of other state supreme courts that present persuasive arguments may be of considerable value. There is a rich body of state constitutional authority on search and seizure law when state courts grapple with the challenging issues under their state constitutions. Such authority is readily available for Iowa practitioners in the pages of the various law reviews, easily accessible electronic databases, and in the works of Robert F. Williams, G. Alan Tarr, Jennifer Friesen, and others. *See generally Baldon*, 829 N.W.2d at 814–20.

Further demonstration of the potential importance of developments in state constitutional law is revealed in *Vance*, 790 N.W.2d at 786–88. In that case, we faced the question of whether counsel was ineffective in failing to recognize *Belton* was under substantial attack in state courts and might no longer be good law for purposes of state constitutional analysis. *Id.* at 787–88. While we were not in a position to determine the question of ineffective assistance on the record before us, *Vance* clearly stands for the proposition that defense counsel should have a working knowledge of the larger state constitutional trends around the country. *Id.* at 789–90.

5. *Practical consequences, including the need for national uniformity.* The last criterion proposed by the State is consideration of practical consequences, including the need for national uniformity.

Interestingly, none of the cases cited by the dissent has a similar criterion with emphasis on national uniformity.[15]

In *Short*, we canvassed reasons why we rejected the argument that national uniformity should be an inhibiting factor in the development of independent state constitutional law. 851 N.W.2d at 487–89. The reasons need not be repeated at length here. Suffice it to say we have generally rejected calls for uniformity on the ground that such calls were inconsistent with the federalist system, would require adoption of constitutional norms diluted by federalist considerations in a context in which federalism concerns were wholly absent,[16] would ironically convert the federal floor into a federal ceiling with respect to individual liberties, and would be inconsistent with our state's history of independent adjudication. *See id.*; *Baldon*, 829 N.W.2d at 825–27; *Ochoa*, 792 N.W.2d at 266 n.4. On this question of whether national uniformity should be an important consideration, our past cases have provided the State with the answer. *See, e.g., Short*, 851 N.W.2d at 487–89; *Baldon*, 829 N.W.2d at 825–27; *Ochoa*, 792 N.W.2d at 266 n.4.

6. *Missing considerations.* A striking feature about the State's neutral criteria is what is not included. Fidelity to underlying constitutional values, for instance, is not a criterion, nor is analytical soundness, nor the right sizing of any rule that might be adopted. These

---

[15]More than thirty years ago, a frequently cited commentary in the Harvard Law Review noted that in considering the development of independent state constitutional law, the interests in uniformity "should seldom be a decisive factor." *Developments in the Law—The Interpretation of State Constitutional Rights*, 95 Harv. L. Rev. 1324, 1395 (1982).

[16]*See Williams v. Florida*, 399 U.S. 117, 136, 90 S. Ct. 1914, 1925, 26 L. Ed. 2d 446, 474 (1970) (Harlan, J., dissenting) (stating that United States Supreme Court interpretations of incorporated rights "simply reflects the lowest common denominator in the scope and function [of the Bill of Rights]").

concepts, however, are at the heart of our independent state constitutional adjudication.

In addition, the State does not mention the potential persuasive power of minority opinions of the Supreme Court. Majority opinions of the Supreme Court may be persuasive, but so too may concurring and dissenting opinions of that Court. Indeed, in *Ochoa*, we relied to a significant extent on Justice Stevens's cogent dissent in *Samson v. California*, 547 U.S. 843, 857, 126 S. Ct. 2193, 2202, 165 L. Ed. 2d 250, 262 (2006) (Stevens, J., dissenting). *Ochoa*, 792 N.W.2d at 282–83. Similarly, in *Callender v. Skiles*, we held a father's liberty interest was given greater protection under the Iowa Constitution than the United States Constitution, citing a dissenting position of Justice Brennan in *Michael H. v. Gerald D.*, 491 U.S. 110, 141, 109 S. Ct. 2333, 2351, 105 L. Ed. 2d 91, 117 (1989) (Brennan, J., dissenting). *Callender v. Skiles*, 591 N.W.2d 182, 191 (Iowa 1999). And, of course, when relying upon dissents, what must be persuasive is the reasoning, not the fact that an opinion reached a particular result. *See Campbell*, 759 P.2d at 1044 n.7.

7. *Summary.* Our caselaw has clearly addressed the significance of the neutral criteria proposed by the State in this case. While we have often considered text, history, and state and federal court precedents, we have refused to create a checklist that would erect a barrier to state constitutional development or provide a basis for unproductive satellite litigation.

Thus, the real problem for the State, and the dissent, is not lack of guidance, but disagreement with the guidance that has been provided. The dissent wants to erect artificial barriers to the development of independent state constitutional law. I reject them. The dissent believes that when the texts of state and federal constitutional provisions are

similar, we should follow the federal model regardless of its lack of persuasive power. I reject that too. The dissent wants a strong presumption that federal law is correct. I say no. The dissent seeks to incorporate wholesale the substantive results of the recent trends in United States Supreme Court caselaw, results that it likes. We have rejected wholesale importation of federal law. We do, however, consider the merits of each case before us and carefully study United States Supreme Court cases, like other authorities, for persuasive power. I reiterate, the problem is not lack of guidance, but only disagreement with the guidance that has been provided.

### III. Arguments on Merits of Automobile Exception.

The dissent takes a position on the merits of the application of the automobile exception under article I, section 8 of the Iowa Constitution to this case. Having urged this court to adopt the State's neutral criteria, I assume the dissent represents the criteria in action. The dissent provides a bulk cite of state authorities that follow the federal approach to the automobile exception in their interpretation of state constitutional law. It does not summarize or address the reasoning of caselaw that comes to a different conclusion because it is not relevant. Unstated, but certainly implied in the criteria embraced by the dissent, is the notion that uniformity is important and the result is justified because the language of the Iowa constitutional provision related to search and seizure is similar to the Fourth Amendment. The opinion is consistent with the dissent's approach to criteria, which is designed to prevent development of independent state constitutional law.

Our cases require a different methodology. Unlike the dissent, I would begin with the text of article I, section 8. From the text, we know the provision states people should be "secure" in their "papers and

effects." Iowa Const. art. I, § 8. The search of a locked safe in an automobile at least raises my constitutional eyebrows in light of the language of the text. Certainly, the constitutional values underlying article I, section 8 are at least potentially implicated by the search of a locked safe in an automobile. We must inquire further.

Unlike the dissent, I would also identify a general framework for consideration of the issues. We have recognized we should apply article I, section 8 "in a broad and liberal spirit." *State v. Height*, 117 Iowa 650, 657, 91 N.W. 935, 937 (1902). We should also recognize that under Iowa law, the warrant requirement is " 'subject only to a few specifically established and well-delineated exceptions.' " *Baldon*, 829 N.W.2d at 791 (majority opinion) (quoting *Schneckloth*, 412 U.S. at 219, 93 S. Ct. at 2043, 36 L. Ed. 2d at 858).

Recognizing the potential implications of article I, section 8 on the search that occurred in this case, I next turn to the underlying rationale of the automobile exception as it has been developed by the United States Supreme Court. Generally, there are two rationales supporting the automobile exception. First, the automobile exception is based upon the view that automobiles are inherently mobile and, as a result, a warrant to search the vehicle should not be required. *See Carroll*, 267 U.S. at 153, 45 S. Ct. at 287, 69 L. Ed. at 551. Second, the automobile exception has been justified on the ground that the owner or occupant of an automobile has a reduced expectation of privacy compared to the privacy ordinarily associated with a home or residence. *United States v. Chadwick*, 433 U.S. 1, 12–13, 97 S. Ct. 2476, 2484, 53 L. Ed. 2d 538, 549 (1977), *abrogated on other grounds by California v. Acevedo*, 500 U.S. 565, 579, 111 S. Ct. 1982, 1991, 114 L. Ed. 2d 619, 633–34 (1991).

This reduced expectation of privacy is based on two theories. First, it is contended that automobiles are used for transportation purposes on the open highway and thus no reasonable expectation of privacy should arise with respect to papers and effects found in automobiles. *Id.* at 12, 97 S. Ct. at 2484, 53 L. Ed. 2d at 549 (citing *Cardwell v. Lewis*, 417 U.S. 583, 590, 94 S. Ct. 2464, 2469, 41 L. Ed. 2d 325, 335 (1974) (plurality opinion)). Second, it is asserted that an owner has a reduced expectation of privacy based on the fact an automobile is subject to substantial regulatory control, including licensure, registration, equipment regulation, and rules of the road. *Id.* at 12–13, 97 S. Ct. at 2484, 53 L. Ed. 2d at 549; *see also California v. Carney*, 471 U.S. 386, 392–93, 105 S. Ct. 2066, 2069–70, 85 L. Ed. 2d 406, 413–14 (1985) (noting pervasive regulation).

Next, I explore the validity of the rationales in light of the purposes of article I, section 8. A review of the literature quickly reveals the rationales behind the automobile exception have been roundly criticized. For instance, Professor Adams has analyzed the automobile exception in detail and found it wanting. James A. Adams, *Search and Seizure As Seen by Supreme Court Justices: Are They Serious or Is This Just Judicial Humor?*, 12 St. Louis U. Pub. L. Rev. 413 (1993) [hereinafter Adams]. According to Professor Adams, the mobility argument in support of the automobile exception "has no basic integrity" when the automobile has been immobilized through impoundment. *Id.* at 424. It has also been argued that while it might have taken hours or days to obtain a warrant when *Carroll* was decided, and therefore a warrant was impractical in the context of an automobile stop, such a rationale no longer applies in today's technological world when warrants may be obtained in minutes rather than hours or days. *See* Chase, 41 B.C. L. Rev. at 87–89.

The rationale supporting the automobile exception based upon a reduced expectation of privacy has also been questioned. For instance, as cited by Professor LaFave, " 'personal effects so stored' " in automobiles are entitled to constitutional protections and that most Americans regard their automobiles as " 'more than merely a method of transportation.' " 3 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 7.2(b), at 735 (5th ed. 2012) [hereinafter LaFave] (quoting Lewis R. Katz, *Automobile Searches and Diminished Expectations in the Warrant Clause*, 19 Am. Crim. L. Rev. 557, 571 (1982) [hereinafter Katz]). Professor Adams agrees decreased expectation of privacy embraced by the Supreme Court "has little to support it" and "merely stating that there is a diminished expectation of privacy in an automobile is not a valid basis for excluding automobiles from the warrant requirement." Adams, 12 St. Louis U. Pub. L. Rev. at 430, 432. Further, Professor LaFave has criticized suggestions that the degree of government regulation justifies vehicle searches. LaFave § 7.2(b), at 735 (citing Katz, 19 Am. Crim. L. Rev. at 571). What relationship does regulation of licensure, tail pipes, and headlamps have with the government's ability to search the interior of the passenger compartment? One might reasonably expect to be stopped by law enforcement for a noisy muffler, broken tail light, or driving without a license, but does that mean a briefcase in the back of the car may be searched by police officers who make a regulatory stop? Should we not interpret article I, section 8 so that it "protects people, not places?" *Katz v. United States*, 389 U.S. 347, 351, 88 S. Ct. 507, 511, 19 L. Ed. 2d 576, 582 (1967).

Certainly the Adams–LaFave points are worthy of serious consideration. Americans take great pride in their automobiles and their

use is a basic feature of modern American life. They are not used simply for transportation. Automobiles are used as temporary homes or even a place to take a snooze after a long (or not so long) drive. Bank statements, recent mail, credit card invoices, love notes, and medical information may be stored in automobiles. Glove compartments and consoles are pretty good places to keep "papers and effects." Professionals driving home from work take bundles of documents with them in both hard and electronic formats that are often placed on the back seat. In an interesting case, a judge noted he frequently takes work home in his automobile and observed that his vehicle was thus a usual mode for transporting "drafts of opinions, notations indicating the probable outcome of submitted cases, and confidential messages from other judges." *United States v. Edwards*, 554 F.2d 1331, 1338 (5th Cir. 1977), *vacated on other grounds* 577 F.2d 883 (5th Cir. 1978). Today, with new electronic devices and wireless networks, it is not unusual for an automobile to serve as a virtual office for the conduct of private business.

It is true of course, as a matter of fact, that automobiles are highly regulated. So are homes. Residents in the city have to comply with all manner of regulations. Do not burn the leaves. Take out the trash. Comply with building codes. No driveway here. Mow the lawn. Repair the sidewalk. Pipe down, for crying out loud, its 2 a.m.! Yet, these regulatory requirements do not serve as a categorical basis to defeat the warrant requirement as to the bedrooms, offices, and studies in all houses. Similarly, when an automobile is subject to registration and various regulatory requirements, these requirements at least arguably have nothing to do with your right to be "secure" in your "papers and

effects" stored in the passenger compartment of the vehicle. So, maybe the regulation theory is at least subject to question.

Then, even assuming there is an automobile exception of some kind, the question arises regarding its scope. In other words, do the facts matter? Does it matter that the vehicle in this case was impounded? Which way does that cut? *See, e.g., Jones v. State*, 856 N.E.2d 758, 762 (Ind. Ct. App. 2006) (discussing impoundment). What about a parked car when the driver is arrested? Does the state have the burden to show, under all the facts and circumstances, that obtaining a warrant was impractical? *See, e.g., State v. Elison*, 14 P.3d 456, 467–68, 471 (Mont. 2000) (requiring individualized showing of exigent circumstances when driver, who was alone, was arrested and handcuffed); *State v. Cooke*, 751 A.2d 92, 100 (N.J. 2000) (holding state had burden of showing both probable cause and exigent circumstances). Or, do we need a bright-line rule so bright that all automobiles are the same regardless of their use or present mobility or lack thereof? *See, e.g., Moore v. State,* 787 So. 2d 1282, 1288 (Miss. 2001) (en banc) (holding automobile exception applies even to vehicles that are immobilized or unmovable). Or, does the bright-line cut the other way, in favor of no automobile exception? *See, e.g., State v. Sterndale*, 656 A.2d 409, 412 (N.H. 1995) (holding there was no automobile exception under New Hampshire Constitution, thereby avoiding the "constitutional quagmire").

Among state courts, there is a split of authority on the question of whether there is a broad automobile exception under state constitutions. *See* 2 Jennifer Friesen, *State Constitutional Law: Litigating Individual Rights, Claims and Defenses* § 11.08, at 11-101 & n.441 (4th ed. 2006). The interesting questions regarding the validity of the automobile

exception and its scope should not be resolved by a declaration that the Iowa Constitution is worded similarly to the Federal Constitution and that federal law must be followed, not with a declaration that we must follow federal law to establish uniformity, and not with a bulk citation of caselaw that supports the automobile exception. Through its neutral criteria, the dissent seeks to prevent consideration of the underlying issues described above. It is our constitutional obligation, however, to do the nitty-gritty work of examining the available authorities and precedents—both state and federal—and determining which approach makes the most sense under article I, section 8 of the Iowa Constitution. In light of the court's disposition, that analysis will await another day.

Cady, C.J., and Wiggins, J., join this special concurrence.

**WATERMAN, Justice (dissenting).**

I respectfully dissent and join the separate dissent of Justice Zager. The majority correctly concludes this traffic stop and arrest were lawful, but then effectively overrules our precedent by requiring suppression of the firearm and narcotics found in the search of the safe behind the driver's seat. In my opinion, this was a lawful search based on either of two exceptions to the warrant requirement: the automobile exception or the search-incident-to-arrest exception. Today's opinion unduly restricts police searches and creates practical problems undermining public safety. I would affirm the district court's evidentiary ruling that applied precedent allowing police to search contemporaneously the vehicle's entire passenger compartment (including containers) at the scene when probable cause supports the arrest of the driver.

The majority disregards how the parties framed the issues and briefed the appeal. Both parties recognized the automobile exception is at issue, yet the majority fails to address that alternative ground for upholding the search. The parties' briefs and the majority opinion are two ships passing in the night. The bench and bar will have to read today's tea leaves to guess the fate of the automobile exception in the next appeal. In my view, that exception should remain good law. The majority also disregards the State's extensive survey of courts and commentators supporting use of neutral interpretive principles to guide departures from federal precedent when we interpret identical provisions of the state constitution. The majority's standardless approach appears result-oriented and provides no guidance. I reiterate my call for our court to adopt neutral interpretive criteria. Applying such criteria here, I

would give the same words the same meaning in the Iowa and federal search and seizure provisions, apply existing precedent, and thereby affirm Gaskins's convictions.

## I. Additional Relevant Facts.

The reader should know some additional relevant facts missing from the majority opinion. The majority minimizes the drugs found in the search of the van as "several" small plastic bags of marijuana and pipes. The district court's ruling is more informative:

> The safe contained: "The Regent" 22 caliber revolver with a scratched off serial number loaded with eight bullets, a scale with marijuana residue, one larger sandwich bag[] containing eleven smaller sandwich bag[s] filled with . . . marijuana, one plastic sandwich bag[] with a larger ball of . . . marijuana, one box of sandwich bag[s], several larger . . . freezer bags with an odor of "raw" marijuana, and various pipes and "one hitter" pipes.
>
> . . . Ultimately, there [were] over forty-two grams of marijuana inside of Gaskins'[s] vehicle. Officers testified that the weight and the bag[s] were indicative of resale and distribution of narcotics. Additionally, persons who engage in resale of marijuana typically carry weapons, like the one found in the safe, for protection.

All of the empty plastic bags tested positive for the presence of marijuana, as did the residue on the scale. The revolver contained Gaskins's fingerprints. The officer who conducted the search of the van testified at the suppression hearing that the safe was within the reach of both Gaskins and his passenger at the time of the stop.

The majority also gives short shrift to relevant testimony at the suppression hearing. Officer Tatum, who initially arrested Gaskins, testified, "People that purchase drugs or sell drugs, they have a tendency not to carry them on their person, they usually hide them in specific places." Officer Tatum further testified that he thought a search of the van would find more drugs in the vehicle, for several reasons. First, he

smelled marijuana from within the van; second, Gaskins initially lied to him by denying that he had any drugs; and third, Gaskins then handed over the single, partially smoked blunt.  As Officer Tatum testified, "Most people that use drugs or sell drugs, . . . have a tendency to carry weapons."  Therefore, he was concerned that Gaskins had a weapon in the van, as well as items related to drug offenses.  These facts further support the district court's findings that the police had probable cause to search the van at the scene, including the safe within Gaskins's reach at the time of the stop.

## II.  The District Court Should Be Affirmed Under Existing Iowa and Federal Precedent.

The search of Gaskins's van was constitutional under our court's precedent and the Fourth Amendment decisions of the United States Supreme Court.  The majority not only departs from federal decisions, it overturns our own caselaw adopting those decisions, violating the principle of stare decisis.  Our court in a unanimous decision recently stated, "Stare decisis alone dictates continued adherence to our precedent absent a compelling reason to change the law."  *Book v. Doublestar Dongfeng Tyre Co.*, 860 N.W.2d 576, 594 (Iowa 2015); s*ee also Ackelson v. Manley Toy Direct, L.L.C.*, 832 N.W.2d 678, 688 (Iowa 2013) ("We are slow to depart from stare decisis and only do so under the most cogent circumstances.").  Indeed, it is difficult to overstate the importance of stare decisis:

> It nearly goes without saying that the doctrine of stare decisis is one of the bedrock principles on which this court is built.  It is an important restraint on judicial authority and provides needed stability in and respect for the law.  The majority acknowledges the importance of this principle but fails to follow the standards we have developed to ensure its protection.  While we would abdicate our role as a court of last resort if we failed to occasionally reexamine

our prior decisions, we must undertake this weighty task only for the most cogent reasons and with the greatest caution.

*Kiesau v. Bantz*, 686 N.W.2d 164, 180 (Iowa 2004) (Cady, J., dissenting).

A commentator recently recaptitulated the values fostered by stare decisis:

> First, as in other contexts, stare decisis fosters Rule of Law values. These include consistency and equal treatment, stability, and predictability at any one time and over time. Following precedent, moreover, saves lawyers and judges from having to rethink every legal question from the ground up whenever a question arises. And precedent affords lawyers and lower court judges common points of reference from which to engage productively.
>
> Second, in the present context, stare decisis fosters constitutionalism. It constrains the exercise of arbitrary power by the Court. It denies the Court freedom to pick and choose the precedents it will follow. It also tends to bring unity to the Constitution as it is practiced over time, and the Court's composition changes.
>
> Third, stare decisis fosters legitimacy, which requires the Court to have, and be perceived as having, adequate legal justifications for its decisions. Justifications flowing from the Court's precedents tend, at the least, to be so perceived. Even when the Justices disagree, the disagreement will be perceived to be one about the law when all of them reason from the same starting points. To the extent possible, the Constitution and precedents interpreting it should form a coherent corpus of law, widely perceived and practiced as such.
>
> . . . .
>
> Both stare decisis and overruling are constitutionally vital. For the reasons to be given below, the Constitution requires the Court to practice stare decisis. It is necessary to the Court's unifying mission, and it is a stabilizing force in a constitutional system under the Rule of Law. In addition, the Rule of Law entails the Court's duty to follow its constitutional precedents: The Court has a duty to follow the law; such precedents are parts of the law; therefore, the Court has a duty to follow such precedents.
>
> At the same time, the Court's power to overrule is vital for maintaining constitutionalism by correcting mistakes and updating the law. Overruling, moreover, is the only effective check on the Court's exercise of its power to interpret the

Constitution. The Court's power to overrule also is essential to the constitutional system's continuing legitimacy.

Steven J. Burton, *The Conflict Between Stare Decisis and Overruling in Constitutional Adjudication*, 35 Cardozo L. Rev. 1687, 1696–97 (2014) (footnotes omitted). Professor Burton also aptly observed, "A Supreme Court not bound by its precedents likely would vacillate over time as its composition changes, yielding unacceptable discontinuity and instability, and deflating the Court's legitimacy." *Id.* at 1710.

I agree with the majority that we should reexamine our search and seizure precedent in light of changes in Fourth Amendment jurisprudence and that *Gant* narrowed *Belton*. *See Arizona v. Gant*, 556 U.S. 332, 345–47, 129 S. Ct. 1710, 1720–21, 173 L. Ed. 2d 485, 496–99 (2009); *New York v. Belton*, 453 U.S. 454, 460, 101 S. Ct. 2860, 2864, 69 L. Ed. 2d 768, 775 (1981). It therefore makes sense to reexamine our Iowa precedent, which adopted the *Belton* rule in 1981. *State v. Sanders*, 312 N.W.2d 534 (Iowa 1981). But, today's departure from *Gant* is unnecessary and ill-advised. For the reasons developed in Justice Zager's dissent, I too would follow *Gant* under article I, section 8 of the Iowa Constitution.

The special concurrence today throws stones from a glass house by accusing the dissenters of infidelity to stare decisis. *See State v. Young*, 863 N.W.2d 249, 277, 281 (Iowa 2015). *Young*, decided this term, overruled *State v. Allen*, 690 N.W.2d 684 (Iowa 2005), a unanimous 2005 decision of our court. *Young*, 863 N.W.2d at 281. Our approach as dissenters consistently honors the half century of precedent of our court following decisions of the United States Supreme Court interpreting identical search and seizure provisions, instead of accepting several recent departures from that body of law beginning with *State v. Ochoa*,

792 N.W.2d 260 (Iowa 2010). *See State v. Baldon*, 829 N.W.2d 785, 837–43 (2013) (Mansfield, J., dissenting) (explaining the dissenters' disagreement with *Ochoa*).[17] The majority opinion's reasoning also casts doubt on the continued validity of the automobile exception under the Iowa Constitution, which further undermines the goals served by stare decisis. The majority fails to reach the automobile exception, based on its myopic assertion that only the search-incident-to-arrest exception is in play in this appeal. I would not shrink from reaching the automobile exception in this appeal. As both parties recognized, the automobile exception provides an alternative ground to uphold the search of Gaskins's van.

**A. Error Preservation.** The majority implicitly concludes the State waived error as to the automobile exception. Yet, the majority generously concludes Gaskins preserved error for his claims under the Iowa Constitution with a cryptic citation in district court. Gaskins never argued in district court that Iowa should depart from precedent to

---

[17]The majority's practice of finding greater rights under article I, section 8 of the Iowa Constitution did not begin with *State v. Tonn*, 195 Iowa 94, 104–07, 191 N.W. 530, 535–36 (1923), *abrogated on other grounds by Mapp v. Ohio*, 367 U.S. 643, 654–55, 81 S. Ct. 1684, 1691, 6 L. Ed. 2d 1081, 1089–90 (1961). *Tonn* declined to follow the federal exclusionary rule while acknowledging the warrantless search was illegal. *Id.* It thus provided *less* protection under the Iowa provision. Moreover, *Tonn* addressed judge-made remedies, rather than the scope of permissible warrantless searches. The same is true of *State v. Cline*, 617 N.W.2d 277 (Iowa 2000), *abrogated on other grounds by State v. Turner*, 630 N.W.2d 601, 602 n.2 (Iowa 2001). *See Baldon*, 829 N.W.2d at 838–39 (Mansfield, J., dissenting). *Tonn* is at best weak support for the view that our court has a history of departing from Fourth Amendment interpretations. First, the Fourth Amendment was not applied to the states until 1961, well after *Tonn*. *See Mapp*, 367 U.S. at 655–57, 81 S. Ct. at 1691–92, 6 L. Ed. 2d at 1090–91. Second, our court's next departure from Fourth Amendment precedent was not until *Cline*, nearly eight decades after *Tonn*. Before and after *Cline*, our court repeatedly adhered to federal search and seizure precedent. *See Baldon*, 829 N.W.2d at 837–89 (collecting cases). In any event, *Tonn* belies the majority's view that the Iowa search and seizure provision provides *greater* protection than the Fourth Amendment. Perhaps for that reason, the *Ochoa* court did not cite *Tonn* to justify its departure from federal precedent in 2010.

abandon the "evidence" prong of *Gant* under our state constitution. Yet, the majority vacates Gaskins's conviction based on that very argument, first made on appeal. The majority thereby reverses the district court for failing to credit an argument the defendant never made at trial. Is it fair to our trial judges and to the State to reverse suppression rulings based on arguments the defendant failed to make in district court? Are we asking our trial judges to foresee changes in the law by our court when the party did not first argue for the change in district court? Are we now expecting trial judges to consider arguments that counsel, lulled by settled precedent, fails to make? Is it not reversible error for the district court to assume the role of partisan advocate? *See Hyler v. Garner*, 548 N.W.2d 864, 876 (Iowa 1996) ("[W]e will not speculate on the arguments [the parties] might have made and then search for legal authority and comb the record for facts to support such arguments."); *see also State v. Hicks*, 791 N.W.2d 89, 97–98 (Iowa 2010) (same); *In re S.P.*, 719 N.W.2d 535, 539–40 (Iowa 2006) (stating "the court is prohibited from assuming the role of an advocate" and calling for "what Edmund Burke described as the 'cold neutrality of an impartial judge'" (quoting *State v. Glanton*, 231 N.W.2d 31, 35 (Iowa 1975))); *State v. Biddle*, 652 N.W.2d 191, 198 (Iowa 2002) (noting the "constitutional right to have a neutral and detached judge");[18] *Inghram v. Dairyland Mut. Ins. Co.*, 215 N.W.2d 239,

---

[18]Given our court's long-standing practice of following Federal Fourth Amendment decisions, it was foreseeable to the parties and district court that in light of *Gant*, we would revisit our search-incident-to-arrest precedent that had relied on *Belton*. *See State v. Vance*, 790 N.W.2d 775, 786–89 (Iowa 2010). It is one thing to expect the bench and bar to foresee our court would apply the new United States Supreme Court decision in *Gant*. A greater degree of prescience is required to foresee the majority's departure today from *Gant* without affirming the suppression ruling under the automobile exception. *See id.* at 790 (affirming the defendant's conviction without deciding the ineffective-assistance claim and stating, "In *Gant*, the Supreme Court noted that even if the *Belton* analysis, as limited by *Gant*, does not uphold the constitutionality of a search, other exceptions to the warrant requirement authorizing

240 (Iowa 1974) (noting that we do not "assume a partisan role and undertake [a party's] research and advocacy").

The majority repeats a result-oriented approach of playing "gotcha" with the State to avoid alternative grounds to uphold a police search, while forgivingly considering a defendant's bare mention of the Iowa Constitution in district court to be sufficient for our court to make new state constitutional law.[19] I instead favor a level playing field, with the same error preservation rules applied to the State and the defense.

---

an officer to search a vehicle might be applicable to uphold the search"); *id.* at 790–91 (Cady, J., dissenting) ("[T]he search [of Vance's vehicle] was clearly permitted under the well-recognized automobile exception to the warrant requirement. The majority's own opinion bears this out.").

[19]For example, in *Ochoa*, this court concluded the State waived several grounds for upholding a warrantless search of a parolee's motel room based on consent. 792 N.W.2d at 291–92. We reversed the court of appeals decision that had relied on Fourth Amendment precedent. *Id.* at 292. The *Ochoa* court decided the case under the Iowa Constitution, even though the defendant had failed to argue the Iowa Constitution in district court or on appeal. *See Baldon*, 829 N.W.2d at 837 & n.46 (Mansfield, J., dissenting) (discussing *Ochoa*).

Similarly, in *State v. Pals,* our court considered the constitutionality of a consent search following a traffic stop. 805 N.W.2d 767, 770–71 (Iowa 2011). The district court and court of appeals upheld the search under Fourth Amendment precedent. *See id.* at 771. The defendant made no argument for broader protection under the Iowa Constitution in district court or on appeal. *Id.* at 784–85 (Waterman, J., dissenting). Nevertheless, the *Pals* majority reversed on state constitutional grounds it raised sua sponte. *Id.* at 779–84. In *Baldon*, our court invalidated a search of a parolee on a state constitutional ground never briefed by defendant. 829 N.W.2d at 837 n.46 (Mansfield, J., dissenting). Yet, the majority refused to consider the State's alternative argument to uphold the search under the special-needs doctrine. *Id.* at 789 (majority opinion). In *State v. Short*, the majority held the State waived an alternative ground to support the search of a probationer's home (a consent-to-search provision in the probation agreement) even though the district court specifically found "the police had the right to search Short's residence under the terms of his probation." 851 N.W.2d 474, 479 (Iowa 2014) (internal quotation marks omitted). Yet, the majority departed from federal precedent to invalidate the search, even though the defendant never argued in district court that the Iowa Constitution provided greater restrictions on police searches than the Fourth Amendment. *See id.* at 509 & n.12 (Waterman, J., dissenting) (protesting the majority's inconsistent approach to error preservation). In each of these cases, the majority took a hypertechnical approach to error preservation against the State to avoid alternative grounds to uphold a search, and blindsided the State by departing from federal precedent in a manner the defendant never argued in district court.

The State put the automobile exception in play at the suppression hearing, arguing, "Clearly we have exigent circumstances. We have got a vehicle. We are not looking at the same type of threshold as a home or something along those lines . . . ." Exigent circumstances (specifically mobility) and the diminished expectation of privacy in a vehicle are rationales supporting the automobile exception, not the search-incident-to-arrest exception. *Compare Gant*, 556 U.S. at 338, 129 S. Ct. at 1716, 173 L. Ed. 2d at 493 ("The [search-incident-to-arrest] exception derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations."), *with United States v. Ross*, 456 U.S. 798, 805–06, 102 S. Ct. 2157, 2163, 72 L. Ed. 2d 572, 582 (1982) (contrasting the search of a structure with the search of an inherently mobile vehicle). The district court's ruling expressly relied on *Ross* as well as *Robbins v. California*, cases adjudicating the automobile exception rather than the search-incident-to-arrest exception. *Robbins v. California*, 453 U.S. 420, 423, 101 S. Ct. 2841, 2844, 69 L. Ed. 2d 744, 749 (1981), *overruled by Ross*, 456 U.S. 798, 102 S. Ct. 2157, 72 L. Ed. 2d 572. The district court necessarily considered the automobile exception in its ruling, and for this reason alone, the automobile exception should be preserved for our review. *See Lamasters v. State*, 821 N.W.2d 856, 864 (Iowa 2012) ("If the court's ruling indicates that the court *considered* the issue and necessarily ruled on it, even if the court's reasoning is 'incomplete or sparse,' the issue has been preserved." (quoting *Meier v. Senecaut*, 641 N.W.2d 532, 540 (Iowa 2002))).

Nor did the State abandon the automobile exception on appeal. To the contrary, both parties focused their appellate arguments on that exception. Gaskins's appellate brief specifically urged our court to abandon the automobile exception under the Iowa Constitution and

devoted fifteen pages to arguing the automobile exception should be found incompatible with the Iowa Constitution. Gaskins never contended the State waived error on the automobile exception. The State's appellate brief in turn argued the search was valid under the automobile exception and urged our court to adhere to our precedent. The State's appellate brief devoted thirty pages to arguing the automobile exception should remain good law under the Iowa Constitution. The issue is preserved for our review. *See State v. Howard*, 509 N.W.2d 764, 768 (Iowa 1993).[20]

When my colleague sua sponte raised error preservation at oral argument, Gaskins's appellate counsel pushed back:

> JUSTICE HECHT: Counsel, to what extent is the automobile exception even really before us? As I read the record on the motion to suppress, the only thing asserted as a justification for no warrant was the search was incident to an arrest and that appears to me to be the only exception that the district court addressed and so why do—why are we even looking beyond that in this case?

> MS. LUCEY: I think if you find that it's not a search incident to arrest, then you need to go to that next step, is there another exception that would uphold this ruling.

> JUSTICE HECHT: Even if it's not asserted by the State?

> MS. LUCEY: I think in prior cases they certainly say that, yes. In *State v. Vance*, there is a dissent that indicated, well, why are we preserving this for postconviction relief if there is this other viable, potential exception.

---

[20]The State argued that Gaskins waived error by failing to assert in district court that the automobile exception should be abandoned. The State observes that if Gaskins had done so, it could have developed the record at the suppression hearing on that issue. A remand would allow the district court to decide the Iowa constitutional claims based on a more fully developed record. *Cf. State v. Hoeck*, 843 N.W.2d 67, 72 (Iowa 2014). But, in my opinion, the record is adequately developed to uphold the search under the automobile exception as well as under the *Gant* search-incident-to-arrest exception.

Later in the argument, Gaskins's counsel again declined my colleague's invitation to argue the State waived the automobile exception:

> To answer your question earlier about preservation, when you look at what the State argued, what the defense argued and what the Judge ultimately decided, it seems like they are talking about search incident to arrest but they use probable cause on occasion. So, [it is] sort of both decided and if there is no justification for the search incident to arrest under *Gant* . . . . None of that was introduced but a fair reading may actually show probable cause in exigent circumstances and that's why I briefed it. Does that help?

The State's counsel, in turn, stated unequivocally at oral argument that "[w]e are talking about the automobile exception." We normally decide appeals based on the issues as framed by the parties. *See Feld v. Borkowski*, 790 N.W.2d 72, 78 (Iowa 2010) ("Our obligation on appeal is to decide the case within the framework of the issues raised by the parties. Consequently, we do no more and no less." (Citation omitted.)). We should follow that approach today and decide whether this search was valid under the automobile exception.

Even if the majority were correct in concluding that the automobile exception was not adequately raised below, we "will uphold a ruling of the court on the admissibility of evidence on any ground appearing in the record, whether urged below or not." *State v. Parker*, 747 N.W.2d 196, 208 (Iowa 2008) (quoting *State v. McCowen*, 297 N.W.2d 226, 227 (Iowa 1980)). While our general rule of error preservation requires that a proper ground be "urged in the district court," there is an exception for evidentiary rulings that we have consistently applied. *DeVoss v. State*, 648 N.W.2d 56, 62 (Iowa 2002). A motion to suppress on constitutional grounds is a challenge to the admissibility of evidence seized from a defendant. Therefore, we may affirm the district court's suppression ruling on any ground appearing in the record, whether urged by the

parties or not. *DeVoss*, 648 N.W.2d at 62; *see also State v. Newell*, 710 N.W.2d 6, 23–24 (Iowa 2006) (indicating appellate court can affirm evidentiary ruling on any ground raised on appeal). I would affirm the suppression ruling based on the automobile exception, which is supported by the record.

**B. The Search Is Valid Under the Automobile Exception.** In *State v. Olsen*, we unanimously adopted the federal standards for the automobile exception. 293 N.W.2d 216, 220 (Iowa 1980) ("In this case we are persuaded that the state constitution should be given the same interpretation as the Federal."). Since then, we have consistently applied the federal interpretation of the automobile exception. *See, e.g., State v. Allensworth*, 748 N.W.2d 789, 792–96 (Iowa 2008) (collecting federal cases); *State v. Maddox*, 670 N.W.2d 168, 174 (Iowa 2003) (applying the automobile exception).[21]

The federal automobile exception, also known as the *Carroll–Chambers* doctrine, is clear, well-settled, and takes a broad view of the exigency created by the mobility of a vehicle. The seminal case of *Carroll v. United States* outlined the doctrine and its reasoning:

> We have made a somewhat extended reference to these statutes to show that the guaranty of freedom from unreasonable searches and seizures by the Fourth Amendment has been construed, practically since the beginning of the government, as recognizing a necessary

---

[21]The separate special concurrence of Chief Justice Cady predicts that EDMS technology will eliminate the need for the automobile exception because officers can obtain warrants electronically from the field. This is not the time to address the impact of EDMS. EDMS was not available statewide at the time of the incident, and Officer Tatum did not have EDMS in his squad car for the search at issue today. Accordingly, neither party briefed the impact of EDMS, and no factual record was made regarding use of EDMS. *See State v. Ritz*, 347 P.3d 1052, 1054, 1060 (Or. Ct. App. 2015) (affirming DUI conviction and warrantless entry to home to apprehend suspect for time-sensitive blood alcohol test, relying on evidence it would have taken officer ninety minutes to obtain warrant using "in-car computer" (internal quotation marks omitted)).

difference between a search of a store, dwelling house, or other structure in respect of which a proper official warrant readily may be obtained and a search of a ship, motor boat, wagon, or automobile for contraband goods, where it is not practicable to secure a warrant, because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought.

267 U.S. 132, 153, 45 S. Ct. 280, 285, 69 L. Ed. 543, 551 (1925). Therefore, the Court concluded, a search would be legal if "the seizing officer shall have reasonable or probable cause for believing that the automobile which he stops and seizes has contraband." *Id.* at 156, 45 S. Ct. at 286, 69 L. Ed. at 552. In *Chambers v. Maroney*, the Court considered a case in which a car was impounded as a result of an arrest and then later searched at a police station. 399 U.S. 42, 44, 90 S. Ct. 1975, 1977, 26 L. Ed. 2d 419, 424 (1970). First, the *Chambers* Court noted that the automobile exception was "wholly different" from the search incident to arrest. *Id.* at 49, 90 S. Ct. at 1980, 26 L. Ed. 2d at 427. Then the Court held:

> For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment.

*Id.* at 52, 90 S. Ct. at 1981, 26 L. Ed. 2d at 428. Next, in *Ross*, the Court faced a new question: "[W]hether, in the course of a legitimate warrantless search of an automobile, police are entitled to open containers found within the vehicle." 456 U.S. at 817, 102 S. Ct. at 2169, 72 L. Ed. 2d at 589. The Court held that police with probable cause to search a vehicle may also search any container within it. *Id.* at 821, 102 S. Ct. at 2171, 72 L. Ed. 2d at 591. The Court explained:

> It is therefore significant that the practical consequences of the *Carroll* decision would be largely nullified if the permissible scope of a warrantless search of an automobile

did not include containers and packages found inside the vehicle. Contraband goods rarely are strewn across the trunk or floor of a car; since by their very nature such goods must be withheld from public view, they rarely can be placed in an automobile unless they are enclosed within some form of container.

*Id.* at 820, 102 S. Ct. at 2170, 72 L. Ed. 2d at 590–91. The Court further stated, "This rule applies equally to all containers, as indeed we believe it must." *Id.* at 822, 102 S. Ct. at 2171, 72 L. Ed. 2d at 592. Finally, in *California v. Acevedo*, the Court reiterated that any container in an automobile may be searched under the automobile exception if law enforcement has probable cause to search the vehicle. 500 U.S. 565, 580, 111 S. Ct. 1982, 1991, 114 L. Ed. 2d 619, 634 (1991) ("We therefore interpret *Carroll* as providing one rule to govern all automobile searches. The police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained.").

Our court has consistently applied the automobile exception:

We have repeatedly held that where there is probable cause and exigent circumstances, a warrantless search does not violate a defendant's constitutional rights against unreasonable searches and seizures. A trailerless semi-truck, because of its inherent mobility, presents an exigent circumstance. This is the so-called "automobile exception" to the well-established legal maxim that warrantless searches are per se unreasonable. Even if police lack a valid warrant, they may search a vehicle if they have probable cause to believe a crime, or evidence thereof, may be found within it.

*Maddox*, 670 N.W.2d at 171 (citations omitted). It is undisputed that Gaskins's van was mobile.[22] Accordingly, this search is valid under the

---

[22]Gaskins was lawfully stopped by the police while driving his van on a public highway. He does not claim he was living in his van. Accordingly, there is no basis for extending the heightened privacy rights for a home to this case. Gaskins's van is not his castle.

automobile exception if the police had probable cause to believe the safe contained evidence.

I agree that the district court correctly found probable cause to search the safe. The majority does not contend otherwise. When Officer Tatum first pulled Gaskins over, he detected a strong odor of marijuana wafting from the van. That alone is probable cause to search the van. *See State v. Watts*, 801 N.W.2d 845, 854–55 (Iowa 2011) (collecting cases and stating that "notably, many other courts have found that the odor of raw or growing marijuana by itself can provide sufficient probable cause for a search"); *State v. Moriarty*, 566 N.W.2d 866, 869 (Iowa 1997) (holding that marijuana odor was part of the basis for probable cause); *State v. Merrill*, 538 N.W.2d 300, 301 (Iowa 1995) (same); *State v. Eubanks*, 355 N.W.2d 57, 59 (Iowa 1984) (holding marijuana odor alone supported probable cause).

Moreover, Gaskins initially lied about possessing marijuana then voluntarily turned over a partially smoked blunt. Officer Tatum testified that drug users frequently keep their drugs hidden nearby and believed, based on his training and experience, that he would find additional drugs in the vehicle. Officer Tatum also testified that drug users frequently carry weapons. Based on the strong odor of marijuana, the admitted presence of the blunt, and Gaskins's initial dishonesty, there was probable cause to search Gaskins's van for additional evidence of drug-related offenses. Nor is the result any different because the contraband was found in a safe:

> The scope of a warrantless search of an automobile thus is not defined by the nature of the container in which the contraband is secreted. Rather, it is defined by the object of the search and the places in which there is probable cause to believe that it may be found.

*Ross*, 456 U.S. at 824, 102 S. Ct. at 2172, 72 L. Ed. 2d at 593. Therefore, the search was proper under the automobile exception.

Gaskins's appellate brief asks us to abandon the automobile exception as inconsistent with the Iowa Constitution. This would be a significant departure from well-established state and federal law, requiring us to overturn *Olsen* and its progeny, including *Maddox,* and to diverge from federal precedent. There is no basis for this departure in our constitutional text or history. *See State v. Short,* 851 N.W.2d 474, 510–12 (Iowa 2014) (Waterman, J., dissenting). Moreover, the automobile exception remains well-recognized in a majority of our sister states:

> To provide greater uniformity in the assessment of individual cases and more consistency with regard to the admissibility of the fruits of vehicular searches based on probable cause, a more easily applied rule—such as that of the federal automobile exception—is called for.
>
> This position is supported by the fact that we, in agreement with the U.S. Supreme Court, have long considered the immobilization of a motor vehicle while securing a search warrant to be an *alternative* to the immediate search of the vehicle because it is far from clear which course constitutes the greater intrusion.

*Commonwealth v. Gary*, 91 A.3d 102, 137 (Pa. 2014); *see also Acevedo*, 500 U.S. at 577, 111 S. Ct. at 1990, 114 L. Ed. 2d at 632 (promulgating a rule for the warrantless search of vehicles and containers, reiterating "the virtue of providing clear and unequivocal guidelines to the law enforcement profession" (internal quotation marks omitted)). *E.g., State v. Winfrey*, 24 A.3d 1218, 1224 (Conn. 2011) (allowing warrantless search of vehicle on probable cause); *State v. Charpentier*, 962 P.2d 1033, 1036 (Idaho 1998) (concluding the Idaho Constitution provided no greater protection than the Fourth Amendment); *People v. Smith*, 447 N.E.2d 809, 813 (Ill. 1983) ("We believe that the Supreme Court's

interpretation of the automobile exception, announced in *Ross*, achieves a fair balance between these competing objectives, and we see no reason at this time to adopt a different standard in applying Illinois constitutional provisions."); *Chavies v. Commonwealth*, 354 S.W.3d 103, 110–12 (Ky. 2011); *State v. Ireland*, 706 A.2d 597, 599 (Me. 1998); *Commonwealth v. Motta*, 676 N.E.2d 795, 800 (Mass. 1997) ("[W]e have also followed the Supreme Court in the area of the automobile exception."); *Moore v. State*, 787 So. 2d 1282, 1288–89 (Miss. 2001); *State v. Zwicke*, 767 N.W.2d 869, 873 (N.D. 2009) (bringing state doctrine in line with federal caselaw); *State v. Brown*, 721 P.2d 1357, 1361 (Or. 1986) ("We agree with the proposition that if police have probable cause to believe that a person's automobile, which is mobile when stopped by police, contains contraband or crime evidence, the privacy rights of our citizens are subjected to no greater governmental intrusion if the police are authorized to conduct an immediate on-the-scene search of the vehicle than to seize the vehicle and hold it until a warrant is obtained."); *State v. Werner*, 615 A.2d 1010, 1014 (R.I. 1992) ("Now that the Supreme Court has dissipated the gray cloud of uncertainty that once encompassed the issue of exigency, we have decided to bring ourselves into conformity with Supreme Court precedent and the Fourth Amendment."); *State v. Anderson*, 910 P.2d 1229, 1238 (Utah 1996) ("Following this court's preference to interpret article I, section 14 [of the Utah Constitution] in accord with the Fourth Amendment, we adopt the rule articulated in *Chambers* and its progeny." (Citation omitted.)); *State v. Tompkins*, 423 N.W.2d 823, 832 (Wis. 1988) ("In that regard, art. I, sec. 11 of the Wisconsin Constitution provides no greater rights than [amend.] IV of the United States Constitution as interpreted by the United States Supreme Court."). These decisions are persuasive and

should be followed to decline Gaskins's invitation to abandon the automobile exception under article I, section 8 of the Iowa Constitution.

**C. The Search Incident to Arrest.** Just one year after adopting the federal standard for the automobile exception in *Olsen*, we did the same for the federal standard of vehicle searches incident to arrest.

> We can, if we choose, impose stricter standards in applying our own constitutional provisions than the United States Supreme Court did in *Belton*. However, we believe *Belton* strikes a reasonably fair balance between the rights of the individual and those of society. We adopt it now as our rule.

*Sanders*, 312 N.W.2d at 539. *Belton* allowed the search of a passenger compartment of a vehicle incident to lawful custodial arrest. *Id.* We have continued to apply this rule since we adopted it. *See, e.g., State v. Garcia*, 461 N.W.2d 460, 463 (Iowa 1990).

As the majority notes, *Chimel v. California*, a case involving the warrantless search of a house after an arrest, is the leading case for the search-incident-to-arrest exception. 395 U.S. 752, 753–54, 89 S. Ct. 2034, 2035, 23 L. Ed. 2d 685, 688 (1969). The *Chimel* Court concluded, "There is ample justification, therefore, for a search of the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." *Id.* at 763, 89 S. Ct. at 2040, 23 L. Ed. 2d at 694. *Belton* applied the *Chimel* rule to a passenger, concluding "we hold that when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." *Belton*, 453 U.S. at 460, 101 S. Ct. at 2864, 69 L. Ed. 2d at 775 (footnote omitted). The *Belton* Court continued:

> It follows from this conclusion that the police may also examine the contents of any containers found within the

passenger compartment, for if the passenger compartment is within reach of the arrestee, so also will containers in it be within his reach.

*Id.* Most recently, in *Gant*, a man was arrested for driving with a suspended license, handcuffed, and placed in the back of a patrol car. 556 U.S. at 335, 129 S. Ct. at 1714, 173 L. Ed. 2d at 491. The arresting officers searched the car and found drugs in a jacket in the backseat. *Id.* The *Gant* Court limited *Belton*:

> Police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest.

*Id.* at 351, 129 S. Ct. at 1723, 173 L. Ed. 2d at 501.

This appeal presents our first opportunity to apply *Gant.* Under *Gant*, the search of Gaskins's van and the safe within it was a valid search to look for evidence of the offense of arrest. *See id.* The majority nevertheless reaches a different result under article I, section 8 of the Iowa Constitution. Neither the text of that provision nor its history supports the conclusion that greater restrictions on law enforcement are required. *See Short*, 851 N.W.2d at 510–12 (Waterman, J., dissenting). For the reasons explained below and in Justice Zager's dissent, I would follow *Gant* under article I, section 8 of the Iowa Constitution.

### III. Practical Problems.

The majority's decision will lead to practical problems and undermine public safety. Under the new rule created today, Officer Tatum could search the safe only while it was within Gaskins's reach, i.e., while Gaskins remained in the driver's seat. Officer Tatum could no longer search the van or safe without a warrant once he removed Gaskins from the van. Why place Iowa peace officers in the position of

choosing whether to search for a weapon while it remains in the suspect's reach, risking a deadly encounter?  Why not continue using existing precedent, allowing the officer to take the safer approach of locking the suspect in the squad car before searching containers in the vehicle that had been within the suspect's reach?[23]

Moreover, why force officers to impound vehicles pending a warrant to conduct a search instead of permitting a quick search at the scene under existing precedent?  Officers who forego the search may lose evidence supporting the arrest.  Officers who impound the vehicle will increase the inconvenience for the driver and occupants.[24]  These encounters will occur under myriad circumstances, including a lone officer who stops a van full of people in a remote area in subzero temperatures.  The majority opinion does not permit the officer to confiscate a container without a warrant.  So, does the officer keep everyone waiting by the side of the road pending delivery of a warrant?  Does the officer instead impound the vehicle and leave the passengers stranded?  Or, does the officer forego the search and potentially leave guns and drugs undetected?

The majority replaces a clear rule allowing a search of the entire passenger compartment upon the arrest of an occupant with a vague, fact-specific rule under which the admissibility into evidence depends on

---

[23]The special concurrence refers to several concurring opinions suggesting the concern for officer safety no longer justifies a warrantless search once a suspect is handcuffed.  Just this month, however, a police officer in New Orleans, Daryl Halloway, was reportedly shot dead by a handcuffed arrestee.  *Suspect sought in killing of New Orleans police officer*, USA Today, June 20, 2015, *available at:* http://www.usatoday.com/story/news/nation/2015/06/20/suspect-sought-slaying-new-orleans-police-officer/29036471/.

[24]The special concurrence argues inconvenience to law enforcement does not justify departures from the warrant requirement, but fails to address the inconvenience to motorists and their passengers that will result from today's decision.

what was within the suspect's reach at the time of the search. We have observed that

> a bright-line rule has the advantage of providing clear guidance to law enforcement personnel. Clarity as to what the law requires is generally a good thing. It is especially beneficial when the law governs interactions between the police and citizens. Law enforcement officials have to make many quick decisions as to what the law requires where the stakes are high, involving public safety on one side of the ledger and individual rights on the other.

*Welch v. Iowa Dep't of Transp.*, 801 N.W.2d 590, 601 (Iowa 2011). Going forward, our district courts will have to decide many more factual issues at suppression hearings to resolve what was or was not within the suspect's reach. And, suspects could simply toss the object of the search out of reach in the back of the van or backseat of the car as the officer approaches, and thereby thwart the search.

Finally, today's decision creates two different rules for state and federal proceedings. "We have an interest in harmonizing our constitutional decisions with those of the Supreme Court when reasonably possible . . . ." *Olsen*, 293 N.W.2d at 219–20. As the State argued in its appellate brief:

> Uniformity also fosters equality under the law, the first core value in the Iowa Judicial Branch's Mission Statement. Unnecessary departures from federal law cause inequity and unfairness. The public is rightly confounded when prosecutions on identical facts face a different fate in Nebraska or Illinois than Iowa. Even more difficult to rationalize is the defendant arrested in Des Moines who cannot be prosecuted in the Polk County District Court, but can be prosecuted up the street in the United States District Court for the Southern District of Iowa.

(Footnote omitted.) All these problems are avoided by adhering to existing precedent.

**IV.  The Need for Neutral Interpretive Principles or Divergence Criteria.**

Our court lacks consensus on the value of neutral interpretive criteria to guide departures from settled federal precedent construing a nearly identically worded search and seizure provision.  This appeal, however, is the first time the State has weighed in specifically advocating for the adoption of such criteria.  In our prior cases debating the use of such criteria, the State had been blindsided by the majority's departure from settled federal precedent and thus had no reason to urge divergence criteria.  Our court's prior decisions lacked the benefit of advocacy by the parties on divergence criteria.  The majority today simply rejects in a footnote the State's request to adopt such criteria without confronting the extensive authorities marshaled by the State.[25]

I will strive to avoid repeating what we have said before, but need to set the stage for this discussion today.  In *State v. Pals*, I argued that our court "should not diverge from well-settled Federal Fourth Amendment precedent unless doing so is required by differences in the text, structure, or history of the Iowa provision."  805 N.W.2d 767, 789 (Iowa 2011) (Waterman, J., dissenting) (citing *State v. Schwartz*, 689 N.W.2d 430, 438–45 (S.D. 2004) (Konenkamp, J., concurring in result)).

---

[25]The special concurrence accuses the dissenters in this case of being engaged in "perpetual dissent" because *Ochoa*, *Pals*, *Baldon*, and *Short* previously rejected the adoption of neutral criteria for deviating from federal interpretation of the Fourth Amendment.  This accusation disregards a couple of points.

First, is a "perpetuity" four days?  On June 26, 2015, we concurred in the court's opinion in *State v. King*, ___ N.W.2d ___ (Iowa 2015), notwithstanding the court's extensive reliance on *Ochoa*, *Baldon*, and *Short*.

Second, the court has never before confronted a party's request (in this case, the State of Iowa) to adopt *specific* neutral criteria—and still has not confronted that argument today.  The lengthy rejection of neutral criteria comes today in a special concurrence, not in the opinion of the court.

In *Baldon*, Justice Appel's special concurrence devoted over thirty pages to trumpeting this court's right to depart from federal precedent without endorsing any interpretive criteria to guide such departures. 829 N.W.2d at 803–35 (Appel, J., concurring). I joined Justice Mansfield's dissent that noted the value of giving deference to federal cases. *Id.* at 836–46 (Mansfield, J., dissenting). The debate continued the next term. *See Short*, 851 N.W.2d at 481–92 (setting forth ten "principles of independent state constitutional law"). The majority specifically rejected use of divergence "criteria" as "a solution in search of a problem." *Id.* at 490. Rather, the majority reiterated that it decides what federal precedent to follow based simply on its own determination of "persuasiveness." *Id.* at 481; *see also Ochoa*, 792 N.W.2d at 267 ("The degree to which we follow United States Supreme Court precedent, or any other precedent, depends solely upon its ability to persuade us with the reasoning of the decision.").[26]

The dissenters in *Short* took issue with the majority's divergence from a unanimous United States Supreme Court decision that has been followed by nearly every other state supreme court without academic criticism. *See id.* at 507–19 (Waterman, J., dissenting) (calling for use of

---

[26]I do not share the majority's self-confidence. I see a difference, for example, between the four-three decision of our court in *Short* finding broader rights for a probationer under the Iowa Constitution, decided without the benefit of adversarial briefing on that issue, and the unanimous decision of the United States Supreme Court in *United States v. Knights*, 534 U.S. 112, 122 S. Ct. 587, 151 L. Ed. 2d 497 (2001), which the *Short* majority, nearly alone among the fifty states, declined to follow. Only one other state supreme court has declined to follow *Knights* on state constitutional grounds. *York v. Wahkiakum Sch. Dist. No. 200*, 178 P.3d 995 (Wash. 2008) (en banc). Before the United States Supreme Court weighs in, Fourth Amendment issues are typically thoroughly vetted in the lower courts and comprehensively briefed by the best legal minds in the nation. We may disagree with the outcome and reach a different result under article I, section 8 of the Iowa Constitution, but should do so only for good reasons that are lacking in this case. The reader can decide whether *Knights* or *Short* should enjoy greater respect and legitimacy.

criteria); *id.* at 519–27 (Mansfield, J., dissenting) (responding to the majority's ten principles); *id.* at 527–45 (Zager, J., dissenting). In response to *Short,* the State in this appeal has called for the adoption of neutral criteria because "*Short* has left the bench and bar without guidance for litigating state-constitution claims." The State aptly observed:

> Our system of constitutional governance makes the bargain with unelected judges that they may invalidate the popular will of the people's elected branches, so long as they remain faithful to constitutional principles and respect the distinction between jurist and legislator. One gauge of faithfulness and judicial legitimacy involves consisten[cy] or divergence between state and federal constitutional law.

(Citations omitted.) Accordingly, the State asks our court to adopt the following "five criteria to guide state constitutional advocacy":

> 1. Development of the claim in lower courts;
>
> 2. constitutional text;
>
> 3. constitutional history, including reports of state constitutional debates and state precedent;
>
> 4. decisions of sister states, particularly when interpreting similar constitutional text; and
>
> 5. practical consequences, including the need for national uniformity.

The State cites an empirical study showing that Washington's adoption of criteria improved advocacy and reduced illegitimate pleas for result-oriented departures from federal law: Richard S. Price, *Arguing* Gunwall*: The Effect of the Criteria Test on Constitutional Rights Claims*, 1 J. Law & Cts. 331, 355–58 (2013). I believe we would see the same benefits from adopting neutral divergence criteria in Iowa.

The Wyoming Supreme Court reaffirmed its use of divergence criteria last year:

> Recourse to our state constitution as an independent source for recognizing and protecting the individual rights of our citizens must spring not from pure intuition, but from a process that is at once articulable, reasonable and reasoned. The analysis required to establish greater protection under the state constitution involves a systematic review of applicable criteria, which may include the six non-exclusive neutral criteria recognized in [*Saldana v. State*, 846 P.2d 604, 622 (Wyo. 1993)]: 1) the textual language of the provisions; 2) differences in the texts; 3) constitutional history; 4) preexisting state law; 5) structural differences; and 6) matters of particular state or local concern.

*Norgaard v. State*, 339 P.3d 267, 275 (Wyo. 2014) (citations omitted) (internal quotation marks omitted).

Such criteria provide guidance for the bench and bar, which is missing from the majority's approach of simply diverging when it finds federal precedent unpersuasive. Today's departure from *Gant* cannot be justified under the *Norgaard* criteria or the criteria proposed by the State. Neither the majority nor the special concurrences cite any textual difference,[27] relevant constitutional history, or policy concerns unique to Iowa to justify the departure under our state constitution. Indeed, there simply is no historical evidence the drafters of the Iowa Constitution intended article I, section 8 to provide *greater* protection than the Fourth Amendment. To the contrary, the fact the framers of the Iowa Constitution used the same search and seizure language shows they

---

[27]The difference between a semicolon and a comma is inconsequential. *See Short*, 851 N.W.2d at 522 (Mansfield, J., dissenting). As the State noted:

> One expects that, if the semicolon in Article I, section 8 fundamentally altered the meaning of that provision, this argument would have emerged at some point within the first 150 years this Court interpreted the Iowa Constitution—not for the first time in 2010.

Neither the wide-ranging special concurrence nor the majority today mentions the semicolon argument as a reason to find broader search and seizure restrictions on law enforcement under the Iowa Constitution. The majority previously relied on that argument. *See Short*, 851 N.W.2d at 501; *Ochoa*, 792 N.W.2d at 268–69.

intended the same protection.[28] The special concurrence acknowledges that textual differences may justify different meanings, but refuses to acknowledge that use of identical wording suggests the same meaning was intended.

The special concurrence—based on its selective view of Iowa history—maintains that two of the framers of the 1857 Constitution "do not seem to be the kind of persons" who would favor judicial deference to United States Supreme Court interpretations of identical Iowa constitutional provisions. This argument based on character evidence would not be credited in a court of law and is unpersuasive to me. The constitutional debates actually show that because some of our framers objected to the 1850 Fugitive Slave Act, they inserted *special* language in the Iowa Constitution to assure the right to a jury trial for fugitive slaves. *See Young*, 863 N.W.2d at 278–79. They did not rely on or anticipate the possibility that our supreme court would devise its own unique interpretations of what was then common constitutional language.

To a large extent, the special concurrence repeats arguments made before, and I refer the reader to past responses to those arguments. *See, e.g., Short*, 851 N.W.2d at 519–27 (Mansfield, J., dissenting). Obviously, as has been noted before, there is a wide spectrum of possibilities between (a) automatically following the United States Supreme Court's

---

[28]The special concurrence cites our court's storied decision, *In re Ralph*, 1 Morris 1 (Iowa 1839). *See also Short*, 851 N.W.2d at 483–84 (citing *In re Ralph*). Justice Mansfield's dissent in *Short* put *In re Ralph* in proper legal and historical context. *Short*, 851 N.W.2d at 523–24 (Mansfield, J., dissenting). *In re Ralph* is not an example of our court choosing to diverge from a United States Supreme Court decision interpreting an identically worded provision found in both the Federal and Iowa Constitutions. *In re Ralph* preceded *Dred Scott* and the adoption of our state constitution and was based on an interpretation of federal law. *See Short*, 851 N.W.2d at 523–24 (Mansfield, J., dissenting).

interpretations in all cases and (b) giving no deference at all to those interpretations. I stand somewhere in the middle, recognizing our independent duty and authority to interpret our own constitution (when the parties argue for such an interpretation), but also our limited wisdom and our limited capacity to improve on the wisdom of others. By contrast, I believe the views advocated by the special concurrence's author, that United States Supreme Court interpretations of identical federal constitutional provisions are entitled to *no* weight and that we may devise our own rules of Iowa constitutional law *even when no one in the case asks us to do so*, fall far outside the mainstream of what state supreme courts are doing.[29]

I agree with this statement by the Utah Supreme Court: "Our jurisprudence does not garner precedential weight if, and only if, we adopt a standard that diverges from federal practice. Such a view contradicts our long-standing practice of looking to federal interpretation for guidance." *State v. Houston*, ___ P.3d ___, ___, 2015 WL 773718, *14 n.133 (Utah Mar. 13, 2015). Adherence to settled federal precedent provides predictability, stability, uniformity, and legitimacy. Without the use of any divergence criteria, the majority's ad hoc approach seems result-oriented and unprincipled. "[T]he concern underlying the legitimacy controversy in both federal and state constitutional law is the same: to ensure that judgments are grounded in law rather than in the

---

[29]In my view, it is the majority's combination of (1) failing to give any deference to established Fourth Amendment interpretations while (2) devising its own interpretations without a proper adversarial process that has been so harmful to jurisprudence. While there are examples of other state supreme courts not following federal constitutional precedent, I am unaware of any other state supreme court that has been so willing to do so sua sponte. *Cf. State v. Tiedemann*, 162 P.3d 1106, 1115 (Utah 2007) (noting that "Tiedemann clearly raised the state constitutional question and submitted arguments, albeit ones the trial court found unpersuasive, below").

judges' policy preferences." G. Alan Tarr, *Understanding State Constitutions* 175 (1998). If identical or nearly identical provisions are interpreted the same, the public will have increased confidence that the decision is "rooted in law rather than in will." *Id.* at 176. The concern of those who believe in judicial restraint is that a diverging court is applying "illegitimate judicial policy preferences." *Id.* Point well taken.

It is therefore unsurprising that many state supreme courts use neutral criteria to determine whether to diverge from federal interpretations of the same or similar language. *See, e.g.*, *State v. Harmon*, 113 S.W.3d 75, 78–79 & n.1 (Ark. 2003); *Kerrigan v. Comm'r of Pub. Health*, 957 A.2d 407, 421 (Conn. 2008); *Gannon v. State*, 704 A.2d 272, 276 & n.4 (Del. 1998); *People v. Tisler*, 469 N.E.2d 147, 157 (Ill. 1984) (requiring "substantial grounds" for departure, including text or history); *People v. Nash*, 341 N.W.2d 439, 446 (Mich. 1983) (requiring a "compelling reason" to depart); *State v. McMurray*, 860 N.W.2d 686, 690 (Minn. 2015);[30] *State v. Muhammad*, 678 A.2d 164, 173 (N.J. 1996) (citing *State v. Hunt*, 450 A.2d 952, 965–66 (N.J. 1982) (Handler, J., concurring)); *Commonwealth v. Edmunds*, 586 A.2d 887, 895 (Pa. 1991); *State v. Jewett*, 500 A.2d 233, 235 (Vt. 1985) ("It would be a serious mistake for this Court to use its state constitution chiefly to evade the impact of the decisions of the United States Supreme Court. Our

---

[30]The special concurrence cites several Minnesota Supreme Court search and seizure decisions departing from federal precedent. The cited decisions predated that court's use of a nonexclusive list of factors for departing from federal precedent beginning in *Kahn v. Griffin*, 701 N.W.2d 815, 829 (Minn. 2005). In *McMurray*, the Minnesota Supreme Court noted it may decline to follow a decision of the United States Supreme Court that (1) makes a "radical departure" from precedent with no persuasive explanation, (2) has "retrenched on a Bill of Rights issue," or (3) fails to adequately protect our citizens' basic rights and liberties." 860 N.W.2d at 690. None of those reasons for diverging apply to *Gant*, which, as noted above, narrowed *Belton* and thereby provides motorists with greater protection against warrantless vehicle searches.

decisions must be principled, not result-oriented."); *State v. Gunwall*, 720 P.2d 808, 813 (Wash. 1986) (en banc) (noting the court uses "criteria to the end that [its] decision will be made for well founded legal reasons and not by merely substituting our notion of justice for that of duly elected legislative bodies or the United States Supreme Court"); *Norgaard*, 339 P.3d at 275 (discussing criteria).

When courts like ours diverge from federal precedent without using divergence criteria, dissenting justices are quick to protest. *E.g., People v. Ramey*, 545 P.2d 1333, 1341, 1342 (Cal. 1976) (Clark, J., dissenting) ("Our deference toward the United States Supreme Court is fast becoming a shell game. . . . Today, because it happens to coincide with their own view, the majority resort to mere dictum in the plurality opinion . . . ."); *People v. Disbrow*, 545 P.2d 272, 284 (Cal. 1976) (Richardson, J., dissenting) ("[O]n what basis do[es] the majority hold that the language of our state Constitution should be construed in a different manner than the substantially identical language of the Fifth Amendment privilege as construed in *Harris*? What circumstance peculiar to California requires that we do so? I can think of none. The majority ha[s] suggested none."), *superseded by constitutional amendment*, Cal. Const. art. I, § 28, subdiv. (d), *as recognized in People v. May*, 748 P.2d 307 (Cal. 1988); *State v. Hempele*, 576 A.2d 793, 817 (N.J. 1990) (Garibaldi, J., dissenting) ("[T]here are no independent state-constitutional grounds to justify our divergence from federal law in this area. The textual language, phrasing, and structures of the [provisions] are virtually identical. There is no state statute on this issue and hence no legislative history that would support interpreting the provision independently of federal law. Unlike those cases in which we have departed from federal search-and-seizure jurisprudence the most

analogous pre-existing state law supports uniform interpretation." (Citations omitted.)).

Many commentators advocate that divergence criteria should be utilized when interpreting state constitutions. *See, e.g.,* Paul G. Cassell, *The Mysterious Creation of Search and Seizure Exclusionary Rules Under State Constitutions: The Utah Example*, 1993 Utah L. Rev. 751, 796 (1993) (identifying four criteria and criticizing unprincipled state constitution decisions); George Deukmejian & Clifford K. Thompson Jr., *All Sail and No Anchor—Judicial Review Under the California Constitution*, 6 Hastings Const. L.Q. 975, 987–96 (1979) (noting commentators consider state constitution departures without criteria to be "result-oriented" and advocating for analysis based on constitutional text, history, and a need for uniformity); Paul S. Hudnut, *State Constitutions and Individual Rights: The Case for Judicial Restraint*, 63 Denv. U. L. Rev. 85, 103–05 (1985) (suggesting criteria are necessary for a principled body of state constitutional law, arguing courts should also consider whether the issue presented concerns national or purely local interests); Steven J. Twist & Len L. Munsil, *The Double Threat of Judicial Activism: Inventing New "Rights" in State Constitutions*, 21 Ariz. St. L.J. 1005, 1065 (1989) (advocating for state constitution decisions "firmly grounded in text and original meaning"); Robin B. Johansen, Note, *The New Federalism: Toward A Principled Interpretation of the State Constitution*, 29 Stan. L. Rev. 297, 318–19 (1977) (setting forth factors). *See generally* Hans Linde, *First Things First: Rediscovering the States' Bills of Rights*, 9 U. Balt. L. Rev. 379, 392 (1980) ("[T]o make an independent argument under the state clause takes homework — in texts, in history, in alternative approaches to analysis. It is not enough to ask the state court to reject a Supreme Court opinion on the comparable federal

clause merely because one prefers the opposite result."); Earl M. Maltz, *The Dark Side of State Court Activism*, 63 Tex. L. Rev. 995 (1985) (criticizing the "noninterpretive" approach, noting approaches based on criteria are more legitimate); Robert F. Utter, *The Practice of Principled Decision-Making in State Constitutionalism: Washington's Experience*, 65 Temp. L. Rev. 1153, 1157 (1992) ("Without neutral criteria to aid in developing or selecting a state constitutional standard, courts relying on the state constitution . . . create the impression that reliance on the state constitution is merely result-oriented—that is, not dictated by sound reasoning."). A recent student note aptly focused on our court's standardless divergence from federal precedent in juvenile sentencing cases and called for our court to adopt principled interpretation standards for adjudicating state constitutional claims. Elisabeth A. Archer, Note, *Establishing Principled Interpretation Standards in Iowa's Cruel and Unusual Punishment Jurisprudence*, 100 Iowa L. Rev. 323, 360 (2014).

The State's appellate brief summarizes the lessons of these authorities as follows:

> State-constitution decisions made without neutral principles or criteria risk being seen as—or actually are—result oriented. Regardless of ideological bent, result-oriented judicial outcomes should be avoided. Today's court may favor expansive protection for criminal offenders, while tomorrow's favors the property rights of the ultra-rich or elevates capitalist concerns above environmental interests. The "persuasiveness" approach taken by this Court in *Short* will allow judges to "mistake personal preferences for constitutional compulsion" and should be abandoned.
>
> . . . .
>
> The problem is this: interpreting the state constitution without reference to federal decisions or any interpretive criteria is like playing a sport where only the referee knows the rules. The players can walk onto the field with a bat and ball, but they don't have any idea how the equipment is to be

used, which points count and which don't, or even how to win. At the end of the game, the referee declares a winner, but the players are left unsatisfied and spectators question the game's legitimacy. So too for this Court after *Short*.

*Short*'s "persuasiveness" rule turns constitutional law into a guessing game—and neither the State nor a defense attorney can fairly guess what will be found most "persuasive" to this Court or predict what constitutional rules will result from litigation. No doubt this will be reflected in briefing that comes before this Court, where state-constitution claims will continue to be inadequately briefed and underdeveloped.

(Footnote and citation omitted.)

I agree with the State's criticism of *Short.* I also agree with the State's criticism of the majority's practice, repeated today, of diverging from federal precedent to decide a state constitutional question without using criteria:

Proceeding down the road of state-constitution divergence without clear criteria or guideposts will mean that all that is required for constitutional change is a change in appellate-court membership. This is inconsistent with the American separation of law and politics, eliminates any distinction between the courts and the elected branches, and injects substantial uncertainty that undermines *stare decisis.* Like a boat without a rudder, the lack of clear interpretive criteria will leave this Court's jurisprudence subject to shifting winds and changing tides, rather than providing the measured stability contemplated by our constitutional framers.

I would encourage the bench and bar to brief and argue divergence criteria to guide our state constitutional adjudication, notwithstanding the majority's failure to acknowledge the value of doing so. None of the various divergence criteria supports the majority's divergence from *Gant* today.

## V. Conclusion.

For these reasons, I would affirm the district court decision.

Mansfield and Zager, JJ., join this dissent.

**ZAGER, Justice (dissenting).**

I join Justice Waterman's dissent. I write separately because I am not persuaded that there are sufficient reasons to justify our departure from *Arizona v. Gant,* 556 U.S. 332, 129 S. Ct. 1710, 173 L. Ed. 2d 485 (2009). Unlike the majority, I would adopt *Gant*'s second prong and hold that "[p]olice may search a vehicle incident to a recent occupant's arrest" when: (1) "the arrestee is within reaching distance of the passenger compartment at the time of the search," *or* (2) "it is reasonable to believe the vehicle contains evidence of the offense of arrest." *Id.* at 351, 129 S. Ct. at 1723, 173 L. Ed. 2d at 501. This standard places reasonable limits on police authority to search a vehicle incident to an arrest and strikes a proper balance between the individual privacy interests at stake and the State's interest in officer safety and evidentiary objectives.

In *Chimel v. California,* 395 U.S. 752, 753–54, 89 S. Ct. 2034, 2035, 23 L. Ed. 2d 685, 688 (1969), police arrested the defendant in his home and "then looked through the entire three-bedroom house, including the attic, the garage, and a small workshop." The Supreme Court of the United States concluded this broad-sweeping search violated the Fourth Amendment. *Id.* at 768, 89 S. Ct. at 2043, 23 L. Ed. 2d at 697. In so concluding, however, the Court recognized that it is reasonable for an arresting officer to search an arrestee's person both for weapons the arrestee could use to escape or resist arrest and to prevent the concealment or destruction of evidence. *Id.* at 762–63, 89 S. Ct. at 2040, 23 L. Ed. 2d at 694. By logical extension, the Court also concluded an arresting officer may search "the area into which an arrestee might reach in order to grab a weapon or evidentiary items." *Id.* at 763, 89 S. Ct. at 2040, 23 L. Ed. 2d at 694. Accordingly, the Court

held that, incident to an arrest, an officer may search "the arrestee's person and the area 'within his immediate control.'" *Id.*

In *New York v. Belton,* 453 U.S. 454, 457–59, 101 S. Ct. 2860, 2862–63, 69 L. Ed. 2d 768, 773–74 (1981), the Court applied *Chimel* in the automobile context. There, an officer stopped a car for speeding. *Id.* at 455, 101 S. Ct. at 2861, 69 L. Ed. 2d at 772. Four men were in the car. *Id.* During the officer's initial encounter with the men, he "smelled burnt marihuana and [saw] on the floor of the car an envelope marked 'Supergold' that he associated with marihuana." *Id.* at 455–56, 101 S. Ct. at 2861–62, 69 L. Ed. 2d at 772. He ordered the men out of the car, placed them under arrest, and separated them on the street so "they would not be in physical touching area of each other." *Id.* at 456, 101 S. Ct. at 2862, 69 L. Ed. 2d at 772 (internal quotation marks omitted). "He then searched the passenger compartment of the car." *Id.* "On the back seat he found a black leather jacket belonging to [the defendant]." *Id.* He unzipped one of the jacket's pockets and found cocaine. *Id.* The defendant moved to suppress the cocaine, asserting the officer's warrantless search of the car violated his Fourth Amendment rights. *Id.*

The Court broadly held that "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." *Id.* at 460, 101 S. Ct. at 2864, 69 L. Ed. 2d at 775 (footnote omitted). While acknowledging the specific search incident to arrest justifications identified in *Chimel,* the Court opted for a workable, bright-line rule based on the generalization that the entire passenger compartment of an automobile is "generally, even if not inevitably, within 'the area into which an arrestee might reach.'" *Id.* at 457–58, 460, 101 S. Ct. at 2862–63, 2864, 69 L. Ed. 2d at 773–75

(quoting *Chimel*, 395 U.S. at 763, 89 S. Ct. at 2040, 23 L. Ed. 2d at 694). Following from this generalization, the Court also concluded that, incident to a lawful arrest, "police may . . . examine the contents of any containers found within the passenger compartment." *Id.* at 460, 101 S. Ct. at 2864, 69 L. Ed. 2d at 775. The Court recognized this rule would result in searches where the likelihood police would discover a weapon or evidence of the crime of arrest was relatively low. *See id.* at 461, 101 S. Ct. at 2864, 69 L. Ed. 2d at 775. However, the Court explained:

> "The authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect. A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification."

*Id.* at 461, 101 S. Ct. at 2864, 69 L. Ed. 2d at 775–76 (quoting *United States v. Robinson*, 414 U.S. 218, 235, 94 S. Ct. 467, 477, 38 L. Ed. 2d 427, 440–41 (1973)).

As recognized by the majority, after *Belton* was decided it became the subject of significant criticism by legal scholars, lower courts, and eventually members of the Supreme Court. *See Thornton v. United States*, 541 U.S. 615, 624, 124 S. Ct. 2127, 2133, 158 L. Ed. 2d 905, 915 (2004) (O'Connor, J., concurring in part) (noting that, after *Belton*, "lower court decisions seem[ed] . . . to treat the ability to search a vehicle incident to the arrest of a recent occupant as a police entitlement rather than as an exception" to the warrant requirement); *id.* at 627, 124 S. Ct. at 2134, 158 L. Ed. 2d at 917 (Scalia, J., concurring in the judgment) ("[C]onducting a *Chimel* search is not the Government's right; it is an exception—justified by necessity—to a rule that would otherwise render

the search unlawful."); *State v. Vance*, 790 N.W.2d 775, 787–88 (Iowa 2010) (collecting commentary criticizing and caselaw rejecting *Belton*). In 2009, this criticism came to a head in *Gant*. *See* 556 U.S. at 337–38, 129 S. Ct. at 1715–16, 173 L. Ed. 2d at 492–93.

In *Gant*, the defendant pulled into the driveway of a house where police were already present. *Id.* at 336, 129 S. Ct. at 1715, 173 L. Ed. 2d at 492. After the defendant exited the vehicle, police placed him under arrest for driving with a suspended license. *See id.* at 336, 129 S. Ct. at 1715, 173 L. Ed. 2d at 491–92. They then secured him in the back of a police vehicle and proceeded to search his car. *Id.* at 336, 129 S. Ct. at 1715, 173 L. Ed. 2d at 492. During the search, police discovered "a gun . . . [and] a bag of cocaine in the pocket of a jacket on the backseat." *Id.*

The Court began its analysis by recognizing that many lower courts understood *Belton* as authorizing "a vehicle search . . . incident to *every* arrest." *Id.* at 342–43, 129 S. Ct. at 1718–19, 173 L. Ed. 2d at 495–96 (emphasis added). Put another way, lower courts had read *Belton* as giving police carte blanche to search a vehicle incident to an arrest. *See id.* Concerned with the potential for police abuse, the Court narrowly construed *Belton*, declined to grant police the right to go on baseless fishing expeditions in the automobile context, and placed reasonable limits on when police may search a vehicle incident to a lawful arrest. *See id.* at 347, 129 S. Ct. at 1721, 173 L. Ed. 2d at 498–99 ("Construing *Belton* broadly to allow vehicle searches incident to any arrest would serve no purpose except to provide a police entitlement, and it is anathema to the Fourth Amendment to permit a warrantless search on that basis."). Specifically, the Court held that "[p]olice may search a vehicle incident to a recent occupant's arrest" when: (1) "the arrestee is within reaching distance of the passenger compartment at the time of the

search," *or* (2) "it is reasonable to believe the vehicle contains evidence of the offense of arrest." *Id.* at 351, 129 S. Ct. at 1723, 173 L. Ed. 2d at 501.

The majority criticizes *Gant*'s second prong as being divorced from *Chimel*'s underlying rationales. I do not necessarily disagree with this assertion. But *Chimel* applied to a residence and not an automobile. Thus, *Chimel*'s rationales aside, there are sound reasons for this court to adopt *Gant*'s second prong.

First, as recognized by the majority, *Gant* did not overrule *Belton*, which applies in the automobile context. Instead, it identified a very specific problem with lower courts' interpretations of *Belton* that permitted police searches of automobiles upon an arrest without limitation. Other decisions of the Court authorized police to arrest individuals for minor infractions, *see Atwater v. City of Lago Vista*, 532 U.S. 318, 354, 121 S. Ct. 1536, 1557, 149 L. Ed. 2d 549, 577 (2001), and to seize individuals for traffic violations irrespective of the "actual motivations of the individual officers involved," *Whren v. United States*, 517 U.S. 806, 813, 116 S. Ct. 1769, 1774, 135 L. Ed. 2d 89, 98 (1996). This created a so-called " 'Iron Triangle' by virtue of which police could make a full search of any vehicle on a mere whim by simply being patient enough to await the driver's minor traffic violation." 3 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 7.1(c), at 698–99 (5th ed. 2012) (quoting Donald A. Dripps, *The Fourth Amendment and the Fallacy of Composition: Determinacy Versus Legitimacy in a Regime of Bright-Line Rules*, 74 Miss. L.J. 341, 392 (2004)); *see also Gant*, 556 U.S. at 345, 129 S. Ct. at 1720, 173 L. Ed. 2d at 497 ("A rule that gives police the power to conduct such a search whenever an individual is caught committing a traffic offense, when there is no basis for believing evidence

of the offense might be found in the vehicle, creates a serious and recurring threat to the privacy of countless individuals."). *Gant* rightly curbs discretionless automobile searches, otherwise permitted by *Belton, Atwater,* and *Whren,* by requiring that police have some basis for the search: for their own safety or to prevent the destruction of evidence; or that the nature of the underlying offense of arrest renders it likely evidence of the crime will be found in the place to be searched, the passenger compartment. That was the narrow issue addressed by the Court in *Gant*; the Court wisely made a conservative change in the law to remedy that specific problem and quell criticism. Presented with the same problem, the majority uses a sledgehammer when a tack hammer will do.

Second, under the Fourth Amendment, automobiles are "a category of 'effects' which give rise to a reduced expectation of privacy," and which possess an inherent exigency—mobility. *Thornton,* 541 U.S. at 631, 124 S. Ct. at 2137, 158 L. Ed. 2d at 920 (Scalia, J., concurring in the result); *see also Wyoming v. Houghton,* 526 U.S. 295, 304, 119 S. Ct. 1297, 1302, 143 L. Ed. 2d 408, 417 (1999) (identifying an automobile's mobile nature as justifying a lesser degree of protection under the Fourth Amendment). This is the doctrinal basis for *Gant*'s second prong. *See Gant,* 556 U.S. at 343, 129 S. Ct. at 1719, 173 L. Ed. 2d at 496 (identifying "circumstances unique to the vehicle context" as justifying departure from *Chimel*'s underlying rationales and citing Justice Scalia's *Thornton* concurrence). We have recognized similar principles under the Iowa Constitution. *See State v. Olsen,* 293 N.W.2d 216, 218, 220 (Iowa 1980) (outlining reasons for treating automobiles differently than other private property under the Federal Constitution—reduced expectation of privacy and inherent mobility—and adopting federal standards for the

automobile exception under the Iowa Constitution). Given the constitutionally relevant considerations unique to automobiles, and considering the harm to be remedied—*unbridled* police discretion—the test articulated by the Supreme Court in *Gant* strikes the proper balance between the individual privacy interests at stake and the State's interest in officer safety and evidentiary objectives. The *Gant* test ensures that police do not stop individuals for minor traffic violations and arrest them for the sole purpose of searching their vehicles. In my opinion, when police arrest the recent occupant of a vehicle based on probable cause, and it is reasonable to believe the vehicle contains evidence related to the offense of arrest, it is not unreasonable for police to search the vehicle for that evidence. Interestingly, this case demonstrates *Gant*'s second prong works. Based on the nature of the underlying offense of arrest, police discovered additional drugs and a weapon.

Third, the rule adopted by the majority unwisely forces an officer to choose between securing an individual early on during a roadside encounter and leaving the individual unsecured so the officer can search the vehicle's passenger compartment. This compromises officer safety and creates an additional opportunity for the destruction or concealment of evidence. *See Thornton*, 541 U.S. at 621–22, 124 S. Ct. at 2131, 158 L. Ed. 2d at 913 (majority opinion) (considering how proposed rule would affect officer behavior and rejecting rule, in part, because it incentivized officers to take unnecessary risks in order to conduct automobile searches). The better rule is one that creates adequate disincentives for an officer to search an automobile when he or she truly has no basis for doing so, without compromising safety and evidentiary objectives. *Gant*'s second prong achieves this objective.

Fourth, as noted by the majority, we had previously adopted the *Belton* rule under the Iowa Constitution. *State v. Sanders*, 312 N.W.2d 534, 539 (Iowa 1981); *see also Vance*, 790 N.W.2d at 786 ("[I]n 1981 the Iowa Supreme Court adopted the *Belton* rule as the proper analysis under the Iowa Constitution."). As discussed above, the *Gant* Court carefully narrowed *Belton* and in so doing preserved police authority to conduct automobile searches incident to an arrest, except in cases where police abuse is most likely. By rejecting *Gant*'s second prong, overruling our prior precedent, and taking a more drastic step than the United States Supreme Court, the majority raises serious stare decisis concerns. *See Gant*, 556 U.S. at 358, 129 S. Ct. at 1727–28, 173 L. Ed. 2d at 505–06 (Alito, J., dissenting) (arguing the Court's de facto overruling of *Belton* violates stare decisis). These concerns go largely unaddressed by the majority.

Finally, the authority cited by the majority in support of rejecting *Gant*'s second prong under the Iowa Constitution is unpersuasive. For example, the majority asserts the *Chimel* Court specifically rejected the historical precedent the *Gant* Court relied on in support of its second prong. Was the *Gant* Court not aware the *Chimel* Court rejected this precedent? In fact, as evidenced by the opinion, the *Gant* Court was aware the *Chimel* Court rejected this precedent. It distinguished *Chimel* by implicitly recognizing that *Chimel* involved a search incident to an arrest in a home as opposed to an automobile. *See Gant*, 556 U.S. at 343, 129 S. Ct. at 1719, 173 L. Ed. 2d at 496 (majority opinion); Geoffrey S. Corn, Arizona v. Gant*: The Good, the Bad, and the Meaning of "Reasonable Belief*," 45 Conn. L. Rev. 177, 208–09 (2012) ("[I]t seems significant that the Court limited the scope of a 'reasonable belief' search to the automobile, and did not extend it to any area within the arrestee's

possession . . . . While the Court is obviously willing to tolerate an expanded search authority in relation to a recent arrestee's automobile, the opinion does not (at least explicitly) indicate an analogous tolerance for other areas within an arrestee's possession, such as her home." (Footnote omitted.)). This distinction is constitutionally significant for the reasons noted above. If the majority believes the Supreme Court incorrectly concluded circumstances unique to the automobile context justify a rule different from *Chimel*'s, the more cogent approach would be to say so and explain why.

Further, many of the out-of-state cases cited by the majority in support of its position that we should diverge from the Supreme Court's interpretation of the Fourth Amendment are unpersuasive. In most cases, they are unpersuasive because of the timing of the decisions or differences in the state constitutional provisions at play. First, most of the out-of-state cases cited by the majority were decided *before* the *Gant* decision in 2009. *See State v. Hernandez*, 410 So. 2d 1381 (La. 1982); *State v. Sterndale*, 656 A.2d 409 (N.H. 1995); *State v. Eckel*, 888 A.2d 1266 (N.J. 2006); *State v. Rowell*, 188 P.3d 95 (N.M. 2008); *Commonwealth v. White*, 669 A.2d 896 (Pa. 1995); *State v. Bauder*, 924 A.2d 38 (Vt. 2007). None of these decisions considered the propriety of *Gant*'s second prong. This is significant because "[t]he decisions of [the Supreme] Court are rendered by nine legal scholars of exceptional distinction. They come only after each case has been the subject of extensive adversarial briefing, argument, and attention." *State v. Baldon*, 829 N.W.2d 785, 837 (Iowa 2013) (Mansfield, J., dissenting). Moreover, the Court is typically aware of diverging state law precedent when it makes its decisions. *See, e.g., Gant*, 556 U.S. at 337–38, 129 S. Ct. at 1715–16, 173 L. Ed. 2d at 492–93 (discussing underlying Supreme Court

of Arizona decision in *Gant,* which adopted *Gant*'s first but not second prong). Thus, when the Court articulated the test in *Gant,* it was aware of state law decisions declining to follow *Belton,* but not conceiving of or adopting a "reasonable to believe" prong. Aware of the available options, five of the Justices concluded the two-prong test best resolved the conflicting principles at play. *Id.* at 354, 129 S. Ct. at 1725, 173 L. Ed. 2d at 503 (Scalia, J., concurring). Four of the Justices would not have gone that far and would have affirmed *Belton* in its entirety. *Id.* at 334, 356, 129 S. Ct. at 1713–14, 1727, 173 L. Ed. 2d at 491, 504 (Alito, J., dissenting). In my opinion, those pre-*Gant* decisions have little persuasive value and are substantially undermined by the Court's subsequent resolution of the issue.

Several of the cases cited by the majority are distinguishable on other grounds. For example, the majority cites a Louisiana case. *See Hernandez,* 410 So. 2d at 1381. But the Louisiana Constitution's search and seizure provision, as a textual matter, is distinguishable from the search and seizure provisions of both the United States Constitution and the Iowa Constitution. *Compare* U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."), *and* Iowa Const. art. I, § 8 ("The right of the people to be secure in their persons, houses, papers and effects, against unreasonable seizures and searches shall not be violated; and no warrant shall issue but on probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the persons and things to be seized."), *with* La. Const. art. I, § 5 (West,

Westlaw through Jan. 1, 2015, amendments) ("Every person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy. No warrant shall issue without probable cause supported by oath or affirmation, and particularly describing the place to be searched, the persons or things to be seized, and the lawful purpose or reason for the search. Any person adversely affected by a search or seizure conducted in violation of this Section shall have standing to raise its illegality in the appropriate court."). As the Supreme Court of Louisiana explained in *Hernandez*:

> Our state constitution's declaration of the right to privacy contains an affirmative establishment of a right of privacy, explicit protections against unreasonable searches, seizures or invasions of property and communications, as well as houses, papers and effects, and gives standing to any person adversely affected by a violation of these safeguards to raise the illegality in the courts. This constitutional declaration of right is not a duplicate of the Fourth Amendment or merely coextensive with it; it is one of the most conspicuous instances in which our citizens have chosen a higher standard of individual liberty than that afforded by the jurisprudence interpreting the federal constitution.

410 So. 2d at 1385 (citation omitted).

Of the two out-of-state cases cited by the majority decided after *Gant*, only one rejects *Gant*'s second prong under its state constitution. *Compare Rose v. Commonwealth*, 322 S.W.3d 76, 79–80 (Ky. 2010) (applying *Gant*), *with State v. Snapp*, 275 P.3d 289, 298 (Wash. 2012) (en banc) (rejecting *Gant*'s second prong under the Washington Constitution). *Snapp*, however, is not persuasive for two reasons. First, the Washington Constitution's search and seizure provision, as a textual matter, differs substantially from both the Fourth Amendment and article I, section 8 of the Iowa Constitution. *Compare* U.S. Const. amend.

IV, *and* Iowa Const. art. I, § 8, *with* Wash. Const. art. I, § 7 (West, Westlaw through amendments approved Nov. 4, 2014) ("No person shall be disturbed in his private affairs, or his home invaded, without authority of law."). As the Washington Supreme Court has recognized, "[A]rticle I, section 7 is not grounded in notions of reasonableness. Rather, it prohibits any disturbance of an individual's private affairs without authority of law." *Snapp*, 275 P.3d at 297. Second, as discussed above, *Gant*'s second prong is premised on circumstances unique to automobiles that the Fourth Amendment deems significant. However, these differences are less significant under the Washington Constitution than the Federal Constitution, which is, in part, why the Washington Supreme Court rejected *Gant*'s second prong. *Id.* at 296–97 (noting that an individual's reduced expectation of privacy in an automobile and increased law enforcement needs due to the automobile's inherent mobility are not as persuasive under the Washington Constitution as they are under the Federal Constitution); *see also State v. Tibbles*, 236 P.3d 885, 887–89 (Wash. 2010) (en banc) (considering the mobile nature of a vehicle as a nondispositive factor in determining whether exigent circumstances justified a warrantless automobile search); *State v. Patton*, 219 P.3d 651, 654 n.4 (Wash. 2009) (en banc) (noting the automobile exception is not recognized under the Washington Constitution). Clearly, this is not true under the Iowa Constitution. *See Olsen*, 293 N.W.2d at 218, 220. The Washington Supreme Court's reasons for rejecting *Gant*'s second prong under its constitution are neither applicable under the Iowa Constitution nor persuasive.

Finally, the majority does not consider at least one state court decision adopting *Gant*'s second prong under its state constitution. *See State v. Dearborn*, 786 N.W.2d 97, 105 (Wis. 2010) ("[W]e hereby adopt

the reasoning in *Gant* as the proper reading of Article 1, Section 11 of the Wisconsin Constitution . . . ."). *Dearborn* demonstrates how *Gant* applies in a real-world situation. In that case, an officer pulled the defendant over, placed him under arrest for driving with a revoked license, and secured him in the back of a squad car. *Id.* at 101. Officers then searched the defendant's truck and discovered marijuana and related paraphernalia. *Id.* The Supreme Court of Wisconsin properly held "[the defendant's] search cannot be upheld under *Gant* on the grounds that relevant evidence might be found in the truck, because the warden could not have reasonably expected to find evidence in the vehicle regarding [the defendant's] revoked license." *Id.* at 106. This is a reasonable, common-sense application of *Gant.*

The majority implies, and the special concurrences expressly assert, that modern technology, including our first-in-the-nation EDMS system, makes obtaining a roadside search warrant quick, easy, and efficient for law enforcement. Accordingly, no exigency justifies relaxing the warrant requirement in this context such that law enforcement should now be required to obtain a search warrant in effectively all roadside-stop cases. Not too much to ask, right? It then chides law enforcement: "[I]f a warrant cannot be expeditiously obtained, the problem is not with the warrant requirement of article I, section 8, but is likely an administrative problem that needs to be resolved by local authorities." These assertions are neither grounded in logic or reality here in Iowa nor are they supported by any authority.

As the special concurrence notes, a federal trial court in the southern district of Iowa has noted that it may take police as little as twenty minutes to obtain a search warrant by telephone. *United States v. Baker,* 520 F. Supp. 1080, 1084 (S.D. Iowa 1981). Of course, the Federal

Rules of Criminal Procedure contain detailed procedures governing warrant requests by telephone or other electronic means. Fed. R. Crim. P. 41(d)(3) (authorizing federal magistrates to issue warrants "based on information communicated by telephone or other reliable electronic means"); *id.* r. 4.1(b) (outlining procedures a federal magistrate must follow when determining whether to issue a warrant based on information communicated by telephone or other electronic means). Similarly, as early as 1972, police in California obtained a warrant to search a home in twelve minutes. *People v. Aguirre*, 103 Cal. Rptr. 153, 155 (App. Dep't Super. Ct. 1972). Not surprisingly, California also has a statute authorizing telephonic search warrants. Cal. Penal Code § 1526(b) (West, Westlaw current with urgency legislation through ch. 9 of 2015 Reg. Sess.); *accord Aguirre*, 103 Cal. Rptr. at 155 ("Nowhere in the language of the section does it appear that the Legislature intended to provide only for oral statements taken in the physical presence of the magistrate. Oral communications may be had by means of telephones, two-way radios or face-to-face communication."). In 1998, an Arizona state court noted that a police department "might" be able to (not that it was *actually* able to like the special concurrence maintains) obtain a warrant in as little as fifteen minutes. *State v. Flannigan*, 978 P.2d 127, 131 (Ariz. Ct. App. 1998). But, in *Flannigan*, police never actually applied for a search warrant, despite the fact that they were required to do so prior to obtaining a blood sample without an individual's consent, and the court indicated that it may have allowed the warrantless search (for a blood sample) had law enforcement had sufficient problems or delay in obtaining the warrant. *Id.* More importantly, the court's statement regarding law enforcement's ability to obtain a warrant was

nothing more than a summary of the record before it, not a global generalization of the speed of the warrant process in Arizona. *Id.*

No one disputes that the prohibition against *unreasonable* searches safeguards people at all times and in all Iowa counties. But, based on nothing more than the three cases noted above and aspirations surrounding EDMS, the majority seems to believe an officer can simply type up a search warrant application, contact a judicial officer, and get permission to search a vehicle irrespective of the time of day or whether the stop occurs in a rural or urban setting. This factual assumption is simply not true. EDMS is not, and in all likelihood will not be, a 24/7 virtual magistrate. And, unlike under the Federal Rules of Criminal Procedure and the California Penal Code, there is no provision under Iowa's search warrant statute authorizing telephonic or electronic warrants. *See generally* Iowa Code §§ 808.1–.15. In fact, the Iowa Code specifically requires that all applications for search warrant be in writing. *See* Iowa Code § 808.3.[31] Further, no party in this case developed a factual record on the speed of the warrant process in Iowa.

How many roadside stops occur after five o'clock? How many on the weekends? What about state holidays such as Memorial Day, the Fourth of July, and Labor Day? The point is, judges are often not available, and finding one may take significant time. Does the majority's get-a-warrant-because-it's-quick-and-easy rule apply at all times? In all places? Is the majority prepared to accept and support telephone applications for search warrants or search warrants by other electronic

---

[31]In very limited circumstances, the Iowa Code authorizes a judge or magistrate to issue a search warrant based on information communicated by telephone. *See, e.g.*, Iowa Code § 321J.10(3) (authorizing a blood test pursuant to a search warrant obtained via telephone under certain, exigent circumstances); *id.* § 462A.14D(3) (same). None of these sections apply in this case.

means? If it is, it has cited to no Iowa case supporting a telephonic or electronic search warrant, and I am likewise unable to find any such authority. Are we really prepared to change our *present*-day search and seizure jurisprudence based on *future* technology? Getting a warrant in this context is not simply a matter of inconvenience for law enforcement. In many cases, given the lack of current infrastructure, obtaining a warrant is both impractical and unrealistic.

If, as the majority maintains, it is really so important that police obtain a search warrant in this context, then it should truly be quick and easy for them to do so. But, even if it were truly that quick and easy, is it really necessary to require a search warrant under most circumstances in this context? *Gant*'s well-reasoned, bright-line analysis provides the answer: No. The majority's holding—"a warrant is generally required before such a search"—is overgeneralized, divorced from reality, and adds little guidance to our search and seizure law.

The majority effectively eliminates searches incident to arrest in the automobile context. Under its new rule, when police make an arrest and remove the arrestee from the automobile, in most cases, they can no longer search the automobile's passenger compartment absent a search warrant. This is not only unreasonable, but leads to absurd results. In my opinion, *Gant* establishes reasonable parameters for when police may search a motor vehicle incident to a lawful arrest. Thus, I would adopt *Gant*'s second prong and hold that "[p]olice may search a vehicle incident to a recent occupant's arrest" when: (1) "the arrestee is within reaching distance of the passenger compartment at the time of the search," *or* (2) "it is reasonable to believe the vehicle contains evidence of the offense of arrest." 556 U.S. at 351, 129 S. Ct. at 1723, 173 L. Ed. 2d at 501. This standard places reasonable limits on police authority to search a

vehicle incident to an arrest, and strikes the proper balance between the individual privacy interests at stake and the State's interest in officer safety and evidentiary objectives. Unfortunately, the majority has charted a different course under the Iowa Constitution. This is not the course this court should take.

Waterman and Mansfield, JJ., join this dissent.